## SPRINGS et al. v. JAMES.

(Supreme Court, Appellate Division, First Department. March 11, 1910.)

1. GAMING (§ 49*)—REMEDIES OF PARTIES—EVIDENCE—SUFFICIENCY.

In an action for the balance due by defendant on transactions in the purchase and sale of cotton on a cotton exchange, evidence *held* to sustain findings of a referee that in all the dealings plaintiffs contemplated actual delivery of the cotton bought and sold, that they did not know that defendant did not intend to deliver or accept delivery of the cotton bought or sold, that the transferable notices and warehouse receipts represented actual cotton, and that it was understood between plaintiffs and defendant that all the transactions were to be on the cotton exchange and according to its rules, which forbade wagering and speculating on prices.

[Ed. Note.—For other cases, see Gaming, Dec. Dig. § 49.*]

2. GAMING (§ 14*)—SALES FOR FUTURE DELIVERY—ILLEGALITY.

That defendant, who gave orders to members of a cotton exchange for the purchase and sale of cotton, did not intend to deliver or accept delivery of the cotton sold or bought, did not render the transactions illegal, where the members of the cotton exchange did not know of such intentions.

[Ed. Note.—For other cases, see Gaming, Dec. Dig. § 14.*]

3. GAMING (§ 36*)—DUTIES OF BROKERS TO PRINCIPAL—FORM OF TRANSACTIONS.

Where members of a cotton exchange, who were given orders by defendant for the purchase and sale of cotton, at all times kept in their possession contracts required by the orders of defendant and all their other customers, the fact that they did not pay cash in their settlements, but made offsets and "rings," according to the custom of the cotton exchange, did not affect the rights and liabilities of defendant toward them.

[Ed. Note.—For other cases, see Gaming, Dec. Dig. § 36.*]

4. GAMING (§ 36*)—RIGHTS AND LIABILITIES OF PARTIES.

Where defendant directed members of a cotton exchange to close out his December contracts by buying 5,000 bales of cotton, but they were unable to complete without bidding the price up, and for his benefit bought January's at the same time, and when December's were offering bought the December's and sold out the January's, making a profit of $75, this amount should be allowed to the defendant on settlement between them.

[Ed. Note.—For other cases, see Gaming, Dec. Dig. § 36.*]

Appeal from Judgment on Report of Referee.

Action by Richard A. Springs and others against David W. James. From a judgment for plaintiffs, defendant appeals. Modified and affirmed.

See, also, 130 App. Div. 900, 115 N. Y. Supp. 1145; 120 N. Y. Supp. 1140.

Argued before INGRAHAM, P. J., and LAUGHLIN, CLARKE, SCOTT, and MILLER, JJ.

Ivins, Mason, Wolff & Hoguet (Herbert D. Mason, of counsel; Robert Louis Hoguet, Victor Lamar Smith, and William L. Ransom, on the brief), for appellant.

John R. Abney (Edward D. Brown, on the brief), for respondents.

CLARKE, J. The plaintiffs are members of the New York Cotton Exchange. The defendant resides in Blakely, Ga., and owns 9,000 acres of land in Georgia and 240 in Alabama, upon which he raises cotton, 1,000 to 1,500 bales a year; owns a cotton warehouse which handles from 6,000 to 8,000 bales a year; is engaged in the mercantile business; in the oil fertilizing business; is the president of three banks; and is a director of two others. He has been engaged for 20 to 25 years in the cotton business, and, upon his own testimony, has bought and sold cotton upon the New York Cotton Exchange through members thereof for 15 or 20 years, and for some two years prior to the beginning of this suit had transacted such business through and with the plaintiffs' and their immediate predecessors in business.

The complaint sets up five causes of action: Three for money laid out and expended for defendant's use and at his request in purchases and sales of cotton for future delivery, upon the New York Cotton Exchange and subject to its rules and regulations, made upon the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

orders of the defendant, statements having been rendered of such transactions, partial payments made by defendant, and promises to pay the balance; the fourth for interest paid on various sums used in said trades; and the fifth upon an account stated for the balance shown upon the final statement rendered of $48,672.13, and a promise to pay.

Summarily stated, the defense is that the New York Cotton Exchange is a bucket shop, and that the matters set forth were gambling transactions upon which there can be no recovery. Subsidiary thereto, defendant claims that the plaintiffs, in their dealings with the cotton bought and sold for his account, so conducted themselves as to violate the law of agency, and thereby to relieve him of all responsibility for their acts and of liability to them.

An enormous record has been presented to this court, setting forth in minute detail, with hundreds of exhibits, the various and intricate steps in a large number of transactions. The whole record has been carefully examined, but no attempt will be made to state more than the ultimate facts.

The New York Cotton Exchange was incorporated by a special act of the New York Legislature. Chapter 365, Laws 1871, amended by statutes passed in the years 1880, 1881, and 1883. Laws 1880, c. 228; Laws 1881, c. 113; Laws 1883, c. 418. The purposes of the corporation, declared in the act, were:

"To provide, regulate and maintain a suitable building, room or rooms, for a cotton exchange, in the city of New York, to adjust controversies between its members, to establish just and equitable principles in the trade, to maintain uniformity in its rules, regulations and usages, to adopt standards of classification, to acquire, preserve, and disseminate useful information connected with the cotton interest throughout all markets, to decrease the local risks attendant upon the business, and generally to promote the cotton trade in the city of New York, increase its amount and augment the facility with which it may be conducted."

The corporation was given power to make all proper and useful by-laws, not contrary to the Constitution and laws of the state of New York or of the United States. There are many by-laws and rules providing for the inspection, classification, storage, sampling, and delivering of cotton, and generally regulating the conduct of the members of the exchange and protecting their customers.

Section 34 of the by-laws provides as follows:

"Any member of the exchange who shall be interested in or associated in business with, or who shall act as the representative of, or who shall knowingly execute any order or orders for the account of any organization, firm, corporation or individual engaged in the business of dealing in differences on the fluctuations in the market price of cotton without a bona fide purchase and sale of the property for an actual delivery (commonly known as a bucket shop), or for any one acting as agent for such organization, firm, corporation or individual, shall be deemed guilty of unmercantile conduct, which renders him unworthy to be a member of the exchange; and upon conviction thereof he shall be expelled from membership in the exchange by the board of managers."

The method of conducting purchases and sales upon the exchange is by public outcry across and around the "ring." The "ring" is a space on the floor of the exchange inclosed within a railing, and en-

circled by an elevated platform two or three feet wide led up to by a step or two. The amount and price are recorded by the exchange reporter.

Section 93 of the by-laws provides as follows:

"No contract for the future delivery of cotton shall be recognized, acknowledged or enforced by the exchange, or any committee or officer thereof, unless both parties thereto shall be members of the New York Cotton Exchange and the contract shall be in the following form, viz.:

"New York Cotton Exchange. Contract. New York ...... I ...... in consideration of one dollar in hand paid, receipt of which is hereby acknowledged, have this day sold to (or bought from) ...... 50,000 lbs. in about 100 square bales of cotton, growth of the United States, deliverable from licensed warehouse, in the Port of New York, between the first and last days of ...... next, inclusive. The delivery within such time to be at seller's option in one warehouse, upon notice to buyer as provided ꞌby the by-laws and rules of the New York ꞌCotton Exchange. The cotton to be of any grade from good ordinary to fair inclusive, and if tinged or stained, not below low middling stained (New York .Cotton Exchange inspection and classification) at the price of ...... cents per pound for middling, with additions or deductions for other grades, according to the rates of the New York Cotton Exchange existing on the day previous to the date of the transferable notice of delivery. Either party to have the right to call for a margin, as the variations of the market for like deliveries may warrant, and which margin shall be kept good. This contract is made in view of, and in all respects subject to the rules and conditions established by the New York Cotton Exchange, and in full accordance with section 92 of the by-laws. ............

"Verbal contracts (which shall always be presumed to have been made in the foregoing form) shall have the same standing, force, and effect as written ones, if notice in writing of such contracts shall have been given by one of the parties thereto to the other party during the day on which such contract was made. or on the next business day thereafter."

Section 118 of the by-laws provides that:

"It shall be the duty of the seller, on the day on which transactions in contracts take place, to furnish a contract or slip, and deliver his own, already signed, the opposite one in blank, to the ꞌbuyer; the latter shall then sign his contract, .or slip, and return it to the seller. * * *"

And the form of the slips is prescribed. A sample of such a "slip" in evidence reads as follows:

"New York, August 31, 1906. Bought of Springs & Co., successors to J. H. Parker & Co., and agree to receive from them, subject to the by-laws and rules of the New York Cotton Exchange, 2,500 b. cotton Dec. delivery at 9.08. R. H. R. & Co."

—which interpreted means 2,500 bales of cotton for December delivery at 9.08 cents per pound, and signed by the member of the exchange buying, and the corresponding sold note or slip specifies that the signor agrees to deliver. This short form or slip under the by-laws is the equivalent of the long form of contract provided for with all its terms and conditions.

Immediately upon executing an order, the member of the exchange notifies his customer by wire and by mail. A sample of the written notice is as follows:

"New York, August 31, 06. Mr. D. W. James., Dear Sir: In accordance with your instructions, we have this day, made the following transactions for your account, subject to the rules and regulations of the New York Cotton Ex-

change.  Sold,· 2500 Dec. 9.08 2500 Dec. 9.09.  Please take notice that all orders for the purchase or sale of cotton, coffee, grain and provisions for future delivery are received and executed with the distinct understanding that actual delivery is contemplated and the party giving the order so understands and agrees.  It is further understood that on all marginal business the right is reserved to close transactions when margins are near exhaustion without notice. Springs & Co., Successors to J. H. Parker & Co."

All of said notice is in print with the exception of the address, the statement of the amount of cotton sold, and the price.

The order for these transactions was transmitted by telegraph in cipher, and the notification of execution was also transmitted by telegraph in cipher.  The cipher was from Shepperson's Code of 1881, which has been in common use by dealers in cotton for many years, and was used by the plaintiffs and defendant through the years of their mutual relations.  This Code contains the following:

"It is distinctly understood that all orders sent by this table are to be subject in all respects to the rules of the cotton exchange of the market where executed."

"With every telegram sent by this table, the following sentence will be read as part of the message, namely, this purchase has been made subject to all the by-laws and rules of our cotton exchange in reference to contracts for the future delivery of cotton."

"All orders sent by this Code to buy or sell for future delivery will be with the distinct understanding that the purchases or sales so ordered are to be in every respect subject to the by-laws and rules of the cotton exchange of the market in which they are executed."

The learned referee has found as matters of fact that, in all the dealings between the plaintiffs and the defendant, the plaintiffs had contemplated actual delivery of the cotton bought and sold for the defendant; in some of the transactions plaintiffs actually received and delivered transferable notices with warehouse receipts for the said cotton; that the plaintiffs did not understand or know that the defendant did not intend to deliver or accept delivery of the cotton sold or bought by the plaintiffs for him, if such were his intentions; that the plaintiffs did not understand or intend that the said orders and requests were orders to pay money according to differences in the cotton market at the time of the purchase and at the time of the sale; that all receipts and deliveries of cotton made by the plaintiffs for the defendant on his contracts were genuine bona fide deliveries and receipts of cotton, and were not understood by the plaintiffs to be fictitious or formal transactions; that the cotton represented by the warehouse receipts received by and delivered by the plaintiffs on the defendant's contracts represented actual cotton of the character and quality capable of being used by actual users of cotton; that the above transactions were not wagers or bets made to depend upon the course of quotations and the prices of cotton on the New York Cotton Exchange, and were not intended by the plaintiffs or understood by the plaintiffs to be such bets or wagers; that all the orders and dealings between the plaintiffs and the defendant were understood by both parties to be intended to be made upon the New York Cotton Exchange and in accordance with its rules, regulations, and customs; that the New York Cotton Exchange was a market for the dealings in actual cotton, for

·delivery and receipt of actual cotton, and was not an association or agency solely for the purpose of wagering and speculating on the fluctuations and prices of cotton.

These findings of fact are sustained by the evidence. That both the parties contemplated that the transactions should take place upon .the cotton exchange and were to be controlled by its rules and customs is not susceptible of argument. The defendant, who, upon his own testimony, has been engaged in doing business through members of the cotton exchange upon that exchange for from 15 to 20 years, and who, the testimony shows, has taken his profits from time to time without objection, for the purpose of avoiding this liability now testifies that his purpose was "to play the market," and that he did not intend either to deliver or receive a pound of the cotton which he ordered the plaintiffs to buy and sell upon the exchange for his account.

If we assume that such testimony, given under such circumstances, is credible, that would not be ground for declaring the transactions illegal.

Bibb v. Allen, 149 U. S. 481, 13 Sup. Ct. 950, 37 L. Ed. 819, was an action for commissions for services rendered and money paid and advanced by plaintiffs for and at the request of the defendants in selling for their account and as their agents cotton for future delivery according to the rules and regulations of the New York Cotton Exchange. The court reasserted the proposition that it is well settled that contracts for the future delivery of merchandise or tangible property are not void, whether such property is in existence in the hands of the seller or to be subsequently acquired, and that the burden of proof is upon the party who seeks to impeach such transactions by showing affirmatively their illegality; that a transaction which on its face is legitimate cannot be held void as a wagering contract by showing that one party only so understood and meant it to be; and, in sustaining a judgment for the plaintiffs, alluded to the fact that in the memorandum or slip contracts the sales were described as made subject to the rules and regulations of the New York Cotton Exchange; that the parties made use in their telegraphic correspondence of Shepperson's Code, and said:

"It is shown that the rules and regulations of the New York Cotton Exchange recognized no contracts except for the sale and purchase of cotton to be actually delivered. These rules and regulations impose upon the seller the obligation to deliver the cotton sold, and upon the purchaser the obligation to receive it. * * * These rules which were authorized to be made by the statute of the state of New York, under which the exchange was incorporated, enter into and form a part of the contracts of sale in this case."

Kingsbury v. Kirwan, 77 N. Y. 612, was an action brought by a cotton broker to recover on short sales of cotton made by them on defendant's orders. The principal defense was that the alleged contracts of sale were mere wagers on the future market price, and so void under the statute. The court stated the rule:

"To render a contract for the purchase and sale of property void as a wagering contract, it must appear to have been the understanding when the contract was made that the property should not be delivered, and that only the difference in the market price should be paid or received."

Held, that the dealings of the parties were not shown to have been wagering transactions so clearly as to justify the court in nonsuiting plaintiffs.

In Story v. Salomon, 71 N. Y. 420, the court said:

"If it had been shown that neither party intended to deliver or accept the shares, but merely to pay differences according to the rise or fall of the market, the contract would have been illegal. We may guess that the parties were speculating upon the fluctuations in the price of the stock, and that the defendant was not to be required to take or deliver any stock in any case, but simply to pay differences. But a contract which can have legal interpretation and effect should not be condemned, without any proof, in that way"—citing with approval Bigelow v. Benedict, 70 N. Y. 202, 26 Am. Rep. 573.

The defendant claims that the plaintiffs have not shown that they have expended and laid out for his benefit the amount sued for; that they did not keep on hand the specific contracts for future ·delivery made by them under his direction for his account up to the time that he directed them to close out the transaction by purchasing or selling, as the case might be; that in their dealings with such contracts they violated their duty as his agents; and that therefore he is relieved from liability.

We do not think that the rules governing the relations of principal and agent apply in their entirety to the relation of the defendant as principal and the plaintiffs as members of the New York Cotton Exchange. They were not employed to buy a specific piece of property and to hold it for his account. No specific cotton, identifiable by marks and numbers, was ever within the contemplation of either party to the contract. By the rules of classification of the cotton exchange, where it was contemplated that the transactions should be had, good delivery could be made of any cotton certified as coming within the classification dealt in to be delivered at any time within the month of delivery specified. Cotton upon the exchange is dealt in by units of 100 bales of 500 pounds each, and such a unit is called a "contract." Actual delivery is made upon transferable notices and warehouse receipt. Such warehouse receipt is transferable from hand to hand and constitutes as valid a delivery as the actual carting away of the cotton itself from the warehouse. The very purpose of an exchange is to facilitate business, and, as the growth of commercial and banking business has necessitated the economy of the banking clearing house, so the stock exchange and the cotton exchange have adopted clearing house facilities.

A broker upon the exchange may represent many customers, and may execute during the day with many other members many contracts both of sale and purchase. It would be as idle to insist upon an actual delivery between the members of the exchange as it would be to compel the banks to cart to each other's banking house the actual money called for by the checks severally received by each upon the other. So that the rules of the exchange provide for certain methods of clearing. It will be remembered that each transaction occurs across the ring, and is evidenced by a so-called "slip," which is in effect a bought and sold note, or, in the vernacular of the exchange, "a contract," which provides for actual delivery. The first method of clear-

ance is by direct settlement. That is, if A. has sold to B., and B. has sold to A., the two contracts are offset one against the other. If there is a difference in the price, that difference is paid. Second, the ring settlement, which consists of three or more transactions which may be offset and by payment of differences lead to the same result. By this offset there is a substitution through the chain or ring of parties. Another method is called the "street let-out," which is simply another method of arriving at a novation or substitution. These transactions are evidenced by the clearing house sheets, and the resulting differences are settled by checks drawn; each party being required to deposit up to $5 a bale as a margin for his transaction from which the payments are made. This settlement of exchange transactions is entirely between the members of the exchange, who only know each other in the transaction, and in no way affects the customer, whose name in such transactions is never, as it called, "given up" to the other side. A. deals with B. as a member of the exchange, upon the exchange contracts; A. not knowing whom B. represents, and B. not knowing whom A. represents. These settlements are not only permitted by the rules of the exchange, but are required. Section 119 of the by-laws provides that:

"In case any member shall purchase or sell by order, and for the account of any person, without notice being given or required of the name of the party from whom such purchase, or to whom such sale was made, and it shall subsequently appear that such purchase or sale may be offset and settled by another contract, made by the said member for account of himself or others, he may make such offset and settlement at any time before the maturity of the original contract, and thereupon the said member, or his firm, if he be trading in the name of a firm of which he is a member, shall be substituted in the place of the said party from whom such purchase, or to whom such sale was originally made, and shall be deemed a party to the contract for all purposes. Such substitution shall not deprive the said member of his right to any sum to which he would be entitled as commission under the original contract."

Rule 6:

" * * * Any member who may find that he holds, for account of his correspondents, contracts, both of sale and purchase, in the same month which offset each other, shall be authorized to offset and settle such accounts and to substitute therefor his own name, and he shall be responsible to his principals for the strict fulfillment of such contracts and shall be liable to them for all damages or loss they may sustain by reason of such substitution."

Rule 7 provides: ·

" * * * That any party holding a contract against another, corresponding in all respects, except as to price, with one held by the other party against him, may close both by giving notice in writing to the opposite party, at any time before notice of delivery; or where a 'ring' may be formed, all parties thereto shall be compelled to settle upon the terms hereinafter prescribed. * * * It shall be the duty of each party to a transferable notice or to direct settlements or to 'rings' that have been accepted and upon which payments are due, to send to the clearing house in a sealed envelope addressed to the party from whom such payments are due * * * a comparison slip of the net balances due on such settlements"—with further provisions providing the details of clearance settlements.

In Chicago Board of Trade v. Christie, etc., 198 U. S. 236, 25 Sup. Ct. 637, 49 L. Ed. 1031, the Supreme Court of the United States had under consideration the question of the legality of the transactions

upon the Board of Trade and the specific methods herein complained of. The direct question was stated by the court as follows:

"It is said that the plaintiff itself keeps the greatest of bucket shops, in the sense of an Illinois statute of June 6, 1887; that is, places wherein is permitted the pretended buying and selling of grain, etc., without any intention of receiving and paying for the property so bought, or of delivering the property so sold."

### Mr. Justice Holmes said:

"It appears that in no less than three-quarters of the transactions in the grain pit there is no physical handing over of any grain, but that there is a settlement, either by the 'direct method,' so called, or by what is known as 'ringing up.' The direct method consists simply in setting off contracts to buy wheat of a certain amount at a certain time, against contracts to sell a like amount at the same time, and paying the difference of price in cash at the end of the business day. The ring settlement is reached by a comparison of books among the clerks of the members buying and selling in the pit, and picking out a series of transactions which begins and ends with dealings which can be set against each other by eliminating those between, as, if A. has sold to B. 5,000 bushels of May wheat, and B. has sold the same amount to C., and C. to D., and D. to A. Substituting D. for B. by novation, A.'s sale can be set against his on simply paying the difference in price." (And the legality of direct settlements, ring settlements, and hedging was asserted.) "The sales in the pits are not pretended, but, as we have said, are meant and supposed to be binding. A 'set-off' is in legal effect a delivery. We speak only of the contracts made in the pits, because in them the members are principals. * * * The proportion of the dealings in the pit which are settled in this way throws no light on the question of the proportion of serious dealings for legitimate business purposes to those which may be classed as wagers, or pretended contracts. No more does the fact that the contracts thus disposed of call for many times the total receipts of grain in Chicago. The fact that they can be and are set off sufficiently explains the possibility, which is no more wonderful than the enormous disproportion between the currency of the country and contracts for the payment of money, many of which in like manner are set off in clearing houses without any one dreaming that they are not paid, and for the rest of which the same money suffices in succession; the less being needed the more rapid the circulation."

### The court also said:

"This court has upheld sales of stock of future delivery and the substitution of parties, provided for by the rules of the Chicago Stock Exchange." Clews v. Jamieson, 182 U. S. 461, 21 Sup. Ct. 845, 45 L. Ed. 1183.

Bearing in mind, then, that the dealings between the plaintiffs and the defendant had reference to and were to be consummated upon the exchange with reference to and controlled by the by-laws, rules, and regulations thereof, which governed the plaintiffs as members thereof, and that those rules and regulations contemplated and required actual performance of the contracts for future delivery, and, as between members, provided for clearances by prescribed methods which could be compelled by any member, and that these methods have been approved by the Supreme Court of the United States holding that a settlement by way of set-off is equivalent to delivery, and that the defendant does not complain that his directions were not carried out, and that he did not receive prompt notice of the sale or purchase, as ordered by him, at the prices reported at the time made, and that he made no question of the accounts received until this suit was brought, what is it that he complains of? That because the contracts which were

purchased or sold for his account were settled by way of substitution and set-off between the plaintiffs and other members of the exchange before the time when he gave his order to close the transaction, therefore no moneys had been laid out and expended for his benefit.

But for every contract that was set off against another contract there was a payment pro tanto, because set-off is payment, and where the prices named in the contract differed an actual payment in money took place. So that the effect, so far as the plaintiffs were concerned, was precisely as if when he did order the transaction closed they had paid out the actual sum which represented the difference between the purchase and the selling price. · No harm came to him by reason of this transaction. The only persons that he ever knew were the plaintiffs; it was upon their faith and credit that he rested when he gave his orders. They never reported to him the names of the persons with whom they had entered into the contract which he had authorized them to make, either the opposite broker or the principals of that broker. He dealt with the plaintiffs, and the rules required that whenever the substitution and set-off occurred they should be responsible for the strict fulfillment of the contract and be liable to the defendant. It also appeared that at all times the plaintiffs, when said offsetting and settling occurred, had on their books and in their possession contracts sufficient to supply the defendant and all other customers who had open contracts upon their books.

So that, it seems to us, he not having sustained the burden of showing that his transactions with the plaintiffs were wagers, and it having been shown that they promptly executed his orders as given, and that his transactions eventuated in a loss which was paid by them in the manner indicated, that, irrespective of the question of an account stated, the plaintiffs sustained their several causes of action and were entitled to the judgment rendered in their favor.

We think that the amount of the judgment should be reduced by the sum of $75. On November 8th the plaintiffs, upon the defendant's direction, undertook to close out his December contracts by buying 5,000 bales. They bought 3,500 bales, but were unable to complete without bidding the price up on the customer. "So, in order to save his money and for his benefit, we bought January's at the same time. We made a sale and a purchase of 1,500 December's at 9.90 which filled in his order, and the firm was then long of the January's and short of December's and as soon after as there was any December's offering they bought in the December's and sold out their January's. That would be a hedge of January's. That was all done in one day. He got his December's at 9.90, whereas if we had bid in the market for them he might have had to pay as high as 9.95. I believe there was a profit of about $75." At the close of the case, plaintiffs' counsel asked the referee to allow the $75 to the defendant in the case. For some reason this was not done. We think that should have been been allowed. However good the intention and favorable the result to the plaintiffs, the fact remains that the defendant is entitled to the credit, and the amount of the judgment should be, accordingly, reduced.

It follows, therefore, that the judgment should be modified by reducing the amount thereof by $75, and, as so modified, affirmed, with costs to the respondents. All concur.