In re TRION MFG. CO.

(District Court, N. D. Georgia. March 21, 1914.)

No. 389.

1. GAMING (§ 14*)—SALES FOR FUTURE DELIVERY—ILLEGALITY.

That a customer giving orders to a member of a cotton exchange for the purchase and sale of cotton did not intend to deliver or accept deliveries of cotton sold or bought while the rules of the exchange contemplated actual deliveries did not render the transaction a gambling transaction.

[Ed. Note.—For other cases, see Gaming, Cent. Dig. §§ 25, 26; Dec. Dig. § 14.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

214 F.—11

2. CORPORATIONS (§ 410*)—ULTRA VIRES ACTS—SPECULATIONS.

The acts of the president of a corporation organized to manufacture cotton goods, with power to engage in a general mercantile business in connection with its factory for the sale of general merchandise to its employés and others, in buying and selling in the name of the corporation cotton futures as a mere matter of speculation, are ultra vires, and the broker conducting the transactions has no claim against the corporation on account thereof.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1629–1632; Dec. Dig. § 410.*]

In Bankruptcy. In the matter of bankruptcy proceedings of the Trion Manufacturing Company, a bankrupt. From an order of the referee, rejecting a claim of Springs & Co. against the bankrupt, it appeals. Approved and confirmed.

John R. Abney, of New York City, for claimant.
Maddox & Doyal, of Rome, Ga., for trustee.

NEWMAN, District Judge. The matter now before the court is brought here on a petition to review by Springs & Co., who sought to prove a claim in bankruptcy against the bankrupt estate. The referee declined to allow proof of claim on the ground: First that it was purely a gambling transaction, and that the amount of the claim sought to be proven could not be proven as a claim against the bankrupt estate for that reason. He also put his refusal to allow proof of this claim upon additional grounds, that is to say, that the transactions were ultra vires of the corporation.

[1] A. S. Hamilton appears to have been the president and treasurer of the Trion Manufacturing Company, and as such he engaged in the transactions in question with the firm of Springs & Co., of New York. The referee finds that with the exception of $67.37, a spot cotton transaction, all of the other items of the account were wagering or gambling transactions. After discussing the matter at some length the referee holds that the claim that the rules of the New York Cotton Exchange, which were in evidence, provide that actual deliveries are contemplated in all trades made on the exchange, was insufficient to support the claim. The referee says that there is no evidence that the Trion Manufacturing Company ever agreed to be bound by such rules, and that, while under certain circumstances he thinks these rules might be binding as between Springs & Co. and the other brokers on the exchange with whom they traded, they would not be binding upon the Trion Manufacturing Company in the absence of an agreement to that effect.

The referee quotes a number of authorities as to the validity of transactions of this kind. At the time, however, the last decision of the Circuit Court of Appeals for the Fifth Circuit, in the case of D. W. James v. Haven & Clement, had not been handed down. That case, decided on March 10, 1914, 211 Fed. 972, 128 C. C. A. ——, was the second decision made by this Circuit Court of Appeals in that case, and after two trials and two verdicts by the juries in favor of the plaintiff.

The court had charged the jury on the second trial of the case of James v. Haven & Clement as follows:

"The defendant, as I understand it, contends, in the first place, that this was a wagering contract purely; that there was no intention on his part to deliver any cotton, or to have any delivered to him; that he was simply gambling on futures. This is the substance of his claim and of his counsel's, as I understand it.

"He also states that what is called 'ringing out' in the cotton contracts on the New York Cotton Exchange is of such a character that it should defeat the plaintiff's right to recover against him, even if he is otherwise entitled to recover. As to this matter of 'ringing out' or 'ringing up,' as it seems to be sometimes called, it has been before the Supreme Court of the United States, and the highest court of the state of New York, and is fully sustained as a legal method of transacting this business. The Supreme Court of the United States says this: 'The ring settlement is reached by a comparison of books among the clerks of the members buying and selling in the pit, and picking out a series of transactions which begins and ends with dealings which can be set against each other by eliminating those between—as, if A. has sold to B. 5,000 bushels of May wheat, and B. has sold the same amount to C., and C. to D. and D. to A. Substituting D. for B. by novation, A.'s sale can be set against his purchase, on simply paying the difference in price.' That is to say, I understand this method of doing business to be treated by the courts, both the Supreme Court of the United States and the Supreme Court of New York, as an entirely legitimate method of transacting this part of the business. Unless you find something in what has been shown here in the evidence as to this ringing out or ringing up, it appears to me that it should have nothing to do with this transaction, and should not interfere with the plaintiff's right to recover, provided he is otherwise entitled to recover.

"Now, the claim has been made, if I understand the claim by the defendant in this case, that, although, as I have just instructed you, this method of transacting the business has been sustained by the courts, and this court should recognize it as legitimate, it is claimed by the defendant that what is called 'ringing out' extinguished these contracts that were made by Haven & Clement for Mr. James; that when the ringing out was made and the matter carried through, all these contracts that they had made for Mr. James were thereby extinguished. You have heard the testimony about that, and what was said about it by counsel on both sides. It is claimed on the part of the plaintiff that this is not true; that the contracts provided that they shall remain in force until they are finally executed, notwithstanding this arrangement; that a contract to deliver on the part of a particular broker who sold to Haven & Clement, or their contract if they sold, existed, and could be enforced under the rules of the Exchange notwithstanding these contracts had, as they call it, been rung out. That is a matter for you to determine under the evidence. I instruct you, under the law as I understand it to be fully established by the courts of the United States and of the state where this occurred, that it is a legitimate way of doing business, whether or not it was followed legitimately in this particular case, or whether or not, as contended to you by counsel for the defendant, it was done in such a way as to extinguish any claim Mr. James might have had, or his brokers on his part, for what was due him. Of course, that is not legitimate. It has been assumed that the matter is so arranged; for example, one of the courts in referring to it likens it somewhat to a clearing house of the banks in cities where the banks have a clearing house arrangement by which they settle their differences without having to give each one a separate check to square things up."

The Circuit Court of Appeals said in their opinion that "no reversible error is shown by the record."

In view of this last decision and the decisions which have preceded, by the Supreme Court of the United States and other courts, and also recently by the Appellate Division of the Supreme Court of New York in the opinion in the case of Springs et al. v. James, 137 App. Div.

110, 121 N. Y. Supp. 1054, the referee was probably in error in his decision against Springs & Co. in this case on the ground that the transactions were mere wagering or gambling contracts on which there could not be a recovery.

[2] This record shows, however, and I think conclusively that Mr. Hamilton was trading in the name of the Trion Manufacturing Company, that is, buying and selling cotton futures as a mere matter of speculation, which, in my opinion, he could not legally do. The corporation could not be bound by any such acts of his as are shown here. These acts were clearly ultra vires. No power is shown in the charter to authorize the corporation to go into such business. It was a corporation to manufacture cotton goods. While the power is given to buy and sell cotton, this could not carry with it the implication that it was authorized to speculate in cotton. To hold that these transactions would probably be binding as against an individual would not be to hold at all that an officer of a corporation could bind the corporation by making such transactions. The referee finds them, with the one exception named, to be speculative pure and simple, that is, speculating on the rise and fall of cotton. It seems to me that the whole character of the transactions, and the evidence with reference thereto, show that Mr. Hamilton was doing this buying and selling of cotton futures as a matter purely of speculation.

Counsel for Springs & Co. places his claim of authority on the part of Mr. Hamilton to carry on this business with his clients largely upon the language of the charter which authorizes them to go into a mercantile business. The record in this case shows that the purpose of this amendment to the charter, authorizing the corporation to engage in a general mercantile business, must have been that they might carry on, in connection with their factory, stores for the sale of general merchandise to their employés and others, which they did to a very large extent. They had power, also, to buy and sell cotton, as stated, but that cannot be held certainly to authorize speculation in cotton futures.

It is further claimed that a corporation has a right to "hedge," as it is called. The finding of the referee as to the facts in this case, which seems to me to be supported by the evidence, would not make any of the items of this claim an effort to protect the corporation against the rise and fall of cotton, but to be speculation pure and simple on the part of Hamilton.

The last finding of the referee is this:

"The trustee sets up that Springs & Co. had paid to A. S. Hamilton for his personal use certain sums, and charged the same to the Trion Manufacturing Company. Under the evidence I do not think any of those items have been proven, except the item of $1,244.67 on August 6, 1906, which amount I find was transferred from the account of the Trion Manufacturing Company to the individual account of A. S. Hamilton. Inasmuch as the evidence shows that Springs & Co. received from Trion Manufacturing Company large sums of money on transactions which are herein found to have been illegal, I find that the trustee of the Trion Manufacturing Company would have the right to set off the sum of $1,244.67 against the amount found due to the claimants by Trion Manufacturing Company. As this amount is largely in excess of the sum of $67.37 found to be due claimants as above, I therefore disallow the claim of Springs & Co. entirely."

This conclusion of the referee seems to be supported by the evidence, and consequently the finding should be that Springs & Co. cannot recover for any amount whatever.

It is therefore ordered that the action of the referee in this matter be, and the same is hereby, approved and confirmed.