## COURT OF APPEALS.

### July 7, 1920.

## THE PEOPLE v. MORTON ATWATER.

### (229 N. Y. 303.)

(1) HYPOTHECATION OF CUSTOMER'S SECURITIES BY BROKER—PENAL LAW, § 956.

"Actual possession exists where the thing is in the immediate occupancy of the party: constructive is that which exists in contemplation of law, without actual personal occupation," and under the provision of the statute (Penal Law, § 21) that all provisions of the Penal Law should not be construed strictly but according to the fair import of their terms to promote justice and effect the objects of the law, a broker who has constructive possession of securities belonging to a customer and hypothecates, pledges or disposes of such securities without the customer's consent has possession thereof within the purview of the statute (Penal Law, § 956). The criminal intent indicated by the statute is the intent merely to hypothecate, pledge or dispose of such securities without such consent.

(2) SAME—WHEN BROKER IN CONSTRUCTIVE POSSESSION OF SECURITIES— RE-HYPOTHECATED FOR RENEWAL NOTE ALTHOUGH HELD BY BANK AS SECURITY FOR ORIGINAL NOTE—CRIMINAL INTENT.

A firm of stockbrokers, which was taking from its customers subscriptions of Liberty bonds, in small lots, subscribed at a national bank for a number of such bonds, to be thereafter issued, and paid the initial per cent required by the government. In order to get the bonds, when issued, the firm gave its collateral note for the balance due on the bonds and gave its check for the amount with instructions to use the money to take

up the bonds, and the bonds, when issued, were held as security for the note. When the note became due the defendant, a member of the firm, gave a renewal note for the same amount reciting therein that the bonds were pledged for its payment. The customers had, in the meantime, paid defendant's firm for their bonds and as against it were entitled to immediate possession thereof. Subsequently it appeared that the firm was insolvent. When the renewal note became due, the bonds held by the bank as collateral were sold to satisfy its lien and the subscribers lost the money which they had paid the firm for such bonds. *Held*, that the defendant in pledging the bonds for the payment of the renewal note was guilty of a felony within the meaning of the statute (Penal Law, § 956) and that it was error for the Appellate Division to reverse the judgment of conviction, on the ground that neither the defendant nor his firm had possession of the Liberty bonds which it hypothecated as security for the renewal note because the bank did not surrender the custody and control thereof to him, but kept them, as it held them, as security for the loan it had previously made to defendant's firm. In legal effect the defendant received the bonds from the bank and delivered them anew to the bank when the new note was given and such re-hypothecation was a renewal of the original offense.

(3) SAME.

It is contended that the bonds did not belong to the customers who had paid the firm for them. The evidence justifies the contrary conclusion. It follows, therefore, that a sale thereof by defendant without authority would have been a conversion, and a sale thereof with the intent to deprive the owners of their property and to appropriate the same to the use of the defendant would have been larceny by embezzlement. (Penal Law, § 1290, subd. 2.)

People v. Atwater, 191 App. Div. 345, reversed.

APPEAL from a judgment entered May 18, 1920, upon an order of the Appellate Division of the Supreme Court in the Second Judicial Department, which reversed a judgment rendered at a Trial Term for the county of Dutchess upon a verdict convicting defendant of the crime of illegal hypothecation of customers' securities and directed a dismissal of the indictment.

The facts, so far as material, are stated in the opinion.

*Raymond E. Aldrich, District Attorney (Edward K. Haas, of counsel), for appellant.* The defendant had the bonds " in

his possession " on the 13th day of February, 1918, within the meaning of subdivision 1 of section 956 of the Penal Law. (Ward v. Dewey, 16 N. Y. 519; Churchill v. Onderdonk, 59 N. Y. 134; Harrison v. People, 50 N. Y. 518; Brown v. Volkening, 64 N. Y. 76; Brown v. Crossman, 206 N. Y. 471; Weston v. Stoddard, 137 N. Y. 119; Comm. v. Tivnan, 8 Gray, 375; Comm. v. Conlin, 188 Mass. 282; Bartley v. State, 55 Neb. 294; People v. Britton, 134 App. Div. 275.) The defendant on the 13th day of February, 1918, did pledge and dispose of the bonds in question within the meaning of the statute. (Jones on Coll. Sec., § 1; Wilson v. Little, 2 N. Y. 443; Clark v. Costello, 79 Hun, 588; Johnson v. Bank, 132 App. Div. 524, 200 N. Y. 593.) The legal title to the bonds in question was in the customers as charged in the indictment. (Hunt v. Marquand, 109 App. Div. 729; Thomas v. Taggart, 209 U. S. 385; Denison v. Emery, 153 Fed. Rep. 427, 163 Fed. Rep. 486; Matter of Meadows, 173 Fed. Rep. 694; Markham v. Jaudon, 41 N. Y. 235; McIntyre v. Whitney, 139 App. Div. 557, 201 N. Y. 526; Rothschild v. Allen, 90 App. Div. 233, 180 N. Y. 561; Strickland v. Magoun, 119 App. Div. 113, 190 N. Y. 545; Richardson v. Shaw, 209 U. S. 365; Mullen v. Quinlan, 195 N. Y. 109; Little v. McClain, 134 App. Div. 197.)

*Frank B. Lown, Charles Morschauser* and *John E. Mack,* for respondent. There was no illegal hypothecation of the bonds for the reason that the bonds never were in the possession of the customers, nor in fact in the possession of the brokers; they never were owned by any of the customers and there were no ear-marks to identify them as being owned by the customers. The title of the bonds was always in the firm of Atwater, Foote & Sherrill. (Penal Law, § 956.) On the whole case, it is clear that the defendant did not originally hypothecate the bonds; that at no time did he do any act with a guilty intent or guilty knowledge; that all his acts were innocently done; that

at no time did he directly or personally in any way profit by any of the acts alleged to have been committed by him, and it does not appear in any way on the trial that the defendant ever intended in any way to commit any wrong, or violate any law. (People v. Manton, 184 App. Div. 770; People v. Razezicz, 206 N. Y. 249; People v. Ledwon, 153 N. Y. 10; People v. Bennett, 49 N. Y. 137, 144; People v. Place, 157 N. Y. 584; People v. Adrogna, 139 App. Div. 595; People v. Bonifacio, 190 N. Y. 150.)

POUND, J.:

On the 21st day of June, 1918, the defendant, together with Gilbert F. Foote, Harold W. Sherrill and Eliot Atwater, composing the firm of Atwater, Foote & Sherrill, of Poughkeepsie, was indicted by the grand jury of Dutchess county upon six counts; three for grand larceny in the first degree, two for hypothecation of customers' securities, and one for receiving stolen goods. The defendant was tried separately. At the close of the evidence the district attorney elected to rely upon the counts of grand larceny in the first degree committed by a bailee or broker (embezzlement), and hypothecation of customers' securities. The other counts were dismissed. The jury convicted the defendant of the crime of hypothecation of customers' securities. This was an acquittal of the charge of grand larceny, and the verdict of the jury was equivalent to a finding that there was no intent to convert the customers' securities to his own use on the part of the defendant.

The facts which led up to the acts charged in the indictment arose as follows: The firm of Atwater, Foote & Sherrill was engaged in the brokerage business in the city of Poughkeepsie. When the government issued Liberty bonds the firm took subscriptions. It received a number of subscriptions for the first Liberty Loan of three and one-half per cent bonds. When the second Liberty Loan was put out it took subscriptions from its customers aggregating about $93,000, many of them being for

small amounts, and received the initial payment of two per centum thereof. The defendant had general charge of the subscriptions. As the subscription blanks were signed by the customers, they were laid upon his desk and he made notations upon them showing whether they were to be paid in full or in installments. He also noted in his own handwriting the bank through which the subscriptions were to be taken. Instead of turning over to the banks the subscriptions of its customers, the firm on various dates from October 16, 1917, to October 27, 1917, subscribed for various amounts of Liberty bonds in its own name at four local banks. At the Merchants National Bank the firm subscribed for bonds aggregating in amount $13,250; and as the subscriptions were made the 2 per cent thereon was paid by the firm to the bank. At about the same time the subscriptions for the remainder of the $93,000 were made to three other banks. On some of the firm's subscriptions it was stated that the subscription was made on behalf of the clients of the firm and on all of them a notation was made of the denomination of bonds required in accordance with the amounts of the customers' subscriptions.

According to the government plan the first payment after the initial 2 per cent was to be made upon the subscriptions on the 15th of November, 1917. On November 14th a collateral note, due in three months, was given by the firm to the Merchants National Bank for the sum of $12,985, being 98 per cent of the subscription made at that bank. This was credited to the firm on the books of the bank, less discount, and on that day the firm gave its check to the bank for the sum of $12,985, with instructions to use the money to take up the bonds. The check was signed by Sherrill. Who signed the note is in doubt. The note was subsequently destroyed and there is no definite evidence on this subject; but there is no doubt that the defendant knew of and participated in this transaction. The bonds were then unissued and the bank was to receive the bonds when

issued and hold them as collateral security for the payment of the firm's note.

Among the subscriptions that were taken through the Merchants National Bank was those of seven women whose names are mentioned in the indictment, the total amount of whose subscriptions aggregated $2,350.    The remainder of the subscriptions at this bank were made by twenty-eight other customers; so that the subscription which the firm made at this bank was intended to supply the bonds for the subscrpitions of thirty-five different customers.

The subscriptions of the seven women mentioned in the indictment were fully paid to the firm on or before the 15th of November, 1917, which was one day after the note was given to the bank.

The bonds came to the bank on or about the 27th or 28th day of November; and, as was customary with securities held as collateral, they were placed in an envelope by the bank and marked with the name of the firm.    No allotment of them among the original subscribers was made.    The bank knew no one in the transaction but the firm.    The firm had an arrangement with the different banks that it might by making payments to the bank on the note release such of the bonds as the firm desired.    As the customers called for the bonds this was done and the bonds were taken from any one of the banks as suited the convenience of the firm; but the money paid to the firm by the seven women was not (except the original 2 per cent) used to release bonds from the lien of the bank but was kept by the firm.    On the 13th of February, 1918, the note fell due.    The defendant, representing the firm, then went to the bank, gave a renewal note for the same amount, to wit, $12,985, due in ninety days, and paid the discount thereon. This note, like the first, was a collateral note in the form usually used among bankers, and recited that $13,250 in amount of second Liberty bonds were pledged for its payment.

For this act of February 13th, alleged to be the hypotheca-

tion of bonds belonging to the seven women, the defendant was indicted and convicted. On the 1st of March, 1918, defendant discovered that two of his partners by dishonest acts had made way with about $750,000 and left the firm hopelessly insolvent. The defendant personally was innocent and ignorant of these transactions and he himself was ruined financially. He supposed at the time the money was borrowed from the bank and the note was renewed and until the March following that the firm was fully solvent. When the note given in February fell due the bonds held by the bank as collateral were sold to satisfy its lien and the seven women lost the money which they had paid the firm on their bond subscriptions.

On appeal from the judgment of conviction the Appellate Division reversed and the indictment was dismissed, " upon the ground, solely, that the evidence, as a matter of law, failed to establish a ' possession ' by the defendant, or a ' pledge ' by him, on the 13th day of February, 1918, of the bonds as charged in the indictment, within the meaning of section 956 of the Penal Law, and that for that reason the facts actually proved did not constitute a crime, this court having reviewed and considered all questions of fact and found no error in the facts as such, and this reversal not being granted as a matter of discretion, the court holding and deciding that the aspect of the evidence most favorable to the People of what happened on the 13th day of February, 1918, failed in the particulars aforesaid to establish the commission of the crime charged."

Subdivision 1 of section 956 of the Penal Law, under which the defendant was convicted, related to " hypothecation of customers' securities," provides as follows, the numbers indicating the elements of the crime:

(1) A person engaged in the business of purchasing and selling as a broker stocks, bonds or other evidences of debt of corporations, companies or associations, who

(2) Having in his possession, for safekeeping or otherwise,

stocks, bonds or other evidences of debt of a corporation, company or association,

(3) belonging to a customer,

(4) without having any lien thereon or any special property therein,

(5) pledges or disposes thereof

(6) without such customer's consent;

" Is guilty of a felony, punishable by a fine of not more than five thousand dollars or by imprisonment for not more than two years, or by both.

" Every member of a firm of brokers, who either does, or consents or assents to the doing of any act which by the provisions of this or the last preceding section is made a felony, shall be guilty thereof."。

The purpose of the statute is plain. A broker having a customer's securities in his possession might be led into hypothecating them for his own speculative purposes without the intent permanently to deprive the true owner of his property or to convert it to the broker's use, but with the confident hope and expectation that he would redeem and restore such securities when the transaction was realized on. The vanity of such hopes has been often demonstrated and the securities of innocent persons have been hypothecated and lost under such conditions that the defense of lack of such criminal intent on a charge of larceny may have seemed plausible. (Parr v. Loder, 97 App. Div. 218, 220.) The criminal intent indicated by this statute is the intent merely to hypothecate the customer's securities without his consent.

The Appellate Division bases its reversal of the judgment of conviction on the ground that defendant or his firm did not have possession of the Liberty bonds which it hypothecated as security for the note of February 13th, because the bank did not surrender the custody and control thereof to him, but kept them, as it held them, as security for the loan it had previously made to defendant's firm. The form of the transaction is thus

looked at and its substance disregarded.    A pledgee has legal
possession during the pledge, but in legal effect the defendant
received from and delivered the bonds anew to the bank when
the new note was given.    The condition of the old pledge was
temporarily fulfilled and the pledgor was entitled to and had
constructively a redelivery to him of the bonds.    To hold other-
wise would unnecessarily limit the effect of the statute.    Take
a case where a customer's securities had been hypothecated in
violation of the statute, but the Statute of Limitations had run
against an indictment based on the original transaction, yet
the securities had been rehypothecated from time to time until
a crash came and the securities were lost to the true owner.
Would it be reasonable to say that the broker did not have con-
structive possession of the securities each time. the note was
renewed and did not exercise sufficient control over them to
bring his act within the statute?    Each hypothecation is a
renewal of the original offense.    " Possession " truly is an
ambiguous term which has a variety of meanings (Pollock &
Wright on Possession in the Common Law), but the meaning
to be given it here is the one that fits the purpose of the statute
as fairly expressed.    " Actual possession exists where the thing
is in the immediate occupancy of the party; constructive is that
which exists in contemplation of law, without actual personal
occupation."    (Brown v. Volkening, 64 N. Y. 76, 80.)

The Penal Law (§ 21) provides:  " The rule that a penal
statute is to be strictly construed does not apply to this chapter
or any of the provisions thereof, but all such provisions must be
construed according to the fair import of their terms, to promote
justice and effect the objects of the law."

The technical construction of the term " possession " urged
by the defendant is not in accord with the declared judicial
purpose to strip facts of legal fiction and to view the substance
of a transaction rather than its external form.    (People ex rel.
Briggs v. Hanley, 226 N. Y. 453.)

Defendant's firm used this transaction, however innocently

in purpose, as a means whereby to get the money of the seven women and at the same time to use their bonds to secure the credit of the firm at the bank.    That was a course of dealing reprehensible in character, even though done with the best intentions and was within the purpose and meaning of the statute.

Some point is also made that the bonds did not belong to the women.    The evidence justifies the contrary conclusion. Atwater himself entered the transaction on the customers' original subscriptions as indicating that such subscriptions were through the Merchants Bank.    The bonds were obtained in the amounts and denominations called for by the subscriptions. The customers were notified; the title to the bonds passed to them.    (LeMarchant v. Moore, 150 N. Y. 209; Keller v. Halsey, 202 N. Y. 588, 597.)    A sale thereof by defendant without authority would have been a conversion.    (Content v. Banner, 184 N. Y. 121, 124.)    A sale thereof with the intent to deprive the owners of their property and to appropriate the same to the use of the defendant would have been larceny by embezzlement.    (Penal Law, § 1290, subd. 2.)

It is urged that no personal blame attaches to defendant and that the result is unjust in that it punishes him for the fault of others.    The law fixes the blame.    Even if no loss to customers had occurred, even if his firm had not failed, the statutory offense would have been complete.    The check on illegal hypothecation of customers' securities is severe.    It is no answer to say that if the firm had not failed no damage would have been sustained.

The judgment of the Appellate Division should be reversed and that of the Trial Term affirmed.

COLLIN, HOGAN and ELKUS, JJ., concur; HISCOCK, Ch. J., McLAUGHLIN and ANDREWS, JJ., dissent.

Judgment reversed, etc.