THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
*v.* BURRILL RUSKAY, Appellant.

**Crimes — stockbroker trading for his own account against order of customer — violation of statutory prohibition impossible where shares bought for customer have been delivered to broker and paid for — failure of evidence to show that any balance of shares purchased for customer remained undelivered or unpaid for at close of period of clearance — sale thereafter by broker for own account of shares of same stock no basis for charge that he matched orders to neutralize each other.**

1. Violation of section 954 of the Penal Law, providing that a stockbroker who trades for his own account against the order of a customer is guilty of a felony, is impossible when once the shares that are to be bought for the customer have been delivered to the broker upon his payment of the price. The order has then been executed, and is no longer subject to be neutralized by a cross-order to sell.

2. Where the evidence of the People, upon trial of an indictment charging defendant, a stockbroker, with trading for his own account against the order of a customer, fails to prove that any balance of shares of the stock ordered to be purchased by the customer remained undelivered or unpaid for at the close of the appropriate period of clearance, the purchase must be deemed to have been then complete, and a sale by defendant, three days thereafter, of shares of the same stock for his own account, forms no sufficient basis for the charge that he matched orders to the end that one should neutralize the other. An order for a sale may not be held to be a trade against an order for a purchase in the absence of some evidence that the purchase was still open at the sale.

*People* v. *Ruskay*, 212 App. Div. 436, reversed.

.(Argued May 6, 1926; decided May 25, 1926.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered April 3, 1925, which affirmed a judgment of the Court of General Sessions of the county of New York rendered upon a verdict convicting the defendant of a violation of section 954 of the Penal Law.

*Martin W. Littleton, Louis B. Eppstein* and *Percival E. Jackson* for appellant.

*Joab H. Banton,* District Attorney (*Felix C. Benvenga* and *William B. Moore* of counsel) for respondent. The evidence establishes the commission of the crime charged in each of its elements. (*Douglas* v. *Carpenter,* 17 App. Div. 329; *Tompkins* v. *Morton Trust Co.,* 91 App. Div. 274; 181 N. Y. 578; *Strickland* v. *Magoun,* 119 App. Div. 113; 190 N. Y. 545; *Wood* v. *Fisk,* 215 N. Y. 233; *Quincey* v. *White,* 63 N. Y. 370; *Knickerbocker* v. *Gould,* 115 N. Y. 533; *People* v. *Crossman,* 241 N. Y. 138; *People* v. *Miles,* 123 App. Div. 862; 192 N. Y. 541; *People* v. *Lovejoy,* 37 App. Div. 52.)

CARDOZO, J.   Defendant, a stockbroker, has been convicted of the crime of trading for his own account against the order of a customer (Penal Law, § 954).

S. S. Ruskay & Co., in which firm the defendant was a partner, were members of the Consolidated Stock Exchange in the city of New York.   On February 17, 1922, they received from one Brunner, a customer, an order for the purchase of 200 shares of Mexican Petroleum stock.   They made a contract at once on the floor of the Exchange for the purchase of the shares from Pearsall & Maloney.   At that time and for some months past, they were seriously embarrassed for lack of money.   The charge is that before Brunner's shares had been paid for or delivered, they sold for their own account on February 20, 200 shares of the same stock to be offset against the purchase.   Suspension and bankruptcy followed a few days later.   The question is whether the evidence makes out the essentials of the crime.

At the outset there is need to recall the precise wording of the statute.   By Penal Law (§ 954)  " A broker, who, being employed by a customer to buy and carry upon margin the stocks, bonds or other evidences of debt of a corporation, company or association, while acting as

broker for such customer in respect of such stocks, bonds or other evidences of debt, sells for his own account the same kind or issue of stocks, bonds or other evidences of debt of such corporation, company or association with intent to trade against the customer's order, or, who, being employed by a customer to sell the stocks, bonds or other evidences of debt of a corporation, company or association, while acting as broker for such customer in respect to the sale of such stocks, bonds or other evidences of debt, purchases for his own account the same kind or issue of stocks, bonds or other evidences of debt of such corporation, company or association, with intent to trade against the customer's order, is guilty of a felony, punishable by a fine of not more than five thousand dollars, or by imprisonment for not more than one year, or by both. Every member of a firm of brokers, who either does, or consents or assents to the doing of any act which by the provisions of this section is made a felony shall be guilty of a violation thereof."

Violation of this statute is impossible when once the shares that are to be bought have been delivered to the broker upon his payment of the price. The order has then been executed, and is no longer subject to be neutralized by a cross-order to sell. True, indeed, it is that the shares thus acquired may still be criminally misapplied. If the broker sells thereafter without his customer's consent, or hypothecates unduly, he offends against another section of the statute (Penal Law, § 956) and is guilty of a felony (*People* v. *Atwater*, 229 N. Y. 303). If in so selling or hypothecating he acts with intent to steal, he offends against section 1290, and is guilty of the crime of larceny (*People* v. *Atwater, supra*). The defendant is not charged either with misappropriation under section 956 or with larceny under section 1290. He is charged with matching orders to the end that one shall neutralize the other. What is charged has not been proved unless at the time of the order for the sale there

was something yet undone upon the order for the purchase. Nothing to the contrary is urged by counsel for the People. The points of difference do not touch the construction of the statute. They have their origin in varying interpretations of the significance of evidence.

Deliveries between brokers, members of the Exchange, are effected through a clearing house. Under the rules of some exchanges, clearances are made daily. Under the rules of the Consolidated Exchange, they are made twice a week, Tuesday and Friday nights. In 1922, February 17 was Friday. The clearance sheets that night covered the purchases and sales for that day. They covered also the purchases and sales for February 15 and 16, the other days included in the same clearance period. Balances reported by the clearing house, whether of cash or securities, are settled the next day. Thus, in the usual course of business, the shares covered by the Friday clearance are delivered and paid for Saturday morning. Balances cannot be ascertained, when the clearance is made daily, by choosing the transactions for half a day and excluding those of the other half. For the same reason, balances are deceptive, when the clearance is made twice a week, if the transactions of one day are considered, and those of other days within the same period of clearance are put aside and disregarded.

The People proved that on February 17, 1922, the defendant's firm bought from Pearsall & Maloney 225 shares of Mexican Petroleum and sold on the same day to the same firm 188 shares of the same stock. There is no complaint as to these sales. The prosecution does not urge that they were for the benefit of the firm itself. They were legitimate transactions for the account of other customers. The record does not even inform us whether the sales were " long " or " short." Upon this showing there was at most a balance of 37 shares to be delivered to the defendant the next morning. The other shares (188 in number) were already in their possession or

under their control. They were delivered through the clearing house by a setoff of purchases and sales (*Springs* v. *James*, 137 App. Div. 110; affd., 202 N. Y. 603; *Board of Trade* v. *Christie Grain & Stock Co.*, 198 U. S. 236; *Fiske* v. *Doucette*, 206 Mass. 275, 282, 284).

The People failed, however, to prove that even a balance of 37 shares was undelivered or unpaid for. Their evidence was limited to the transactions on a single day (February 17) with a single firm of brokers, the firm of Pearsall & Maloney. There was no attempt to prove the transactions of any other day within the same period of clearance. There was no attempt to prove the transactions with other firms. For all that appears, the clearance sheets of February 17 would show that the sales for the period then ending were greater than the purchases. In that event, no further act of delivery would be needed to make the purchases complete, since the shares already on hand would be utilized therefor. We do not need to go into the question whether this conclusion would be affected if the sales were shown to be " short." There is no suggestion in the record that they were. For all that the People have shown, the defendant's firm had already in their possession on the morning of February 18, 1922, 200 shares of Mexican Petroleum stock, allocated to Brunner's order and held for his account. Nothing done thereafter by wrongful sale or hypothecation could undo what had thus been done. Misappropriation or larceny might ensue. The time for " bucketing " or cross-trading had gone by. The People went to trial upon an indictment which made it necessary for them to show that on February 20 when the cross-sale is charged to have been ordered, there was yet some act to be performed for the execution, complete and indefeasible, of the order from the customer to buy. One cannot frustrate the doing of an act already done.

As to yet another basic element, the People's case has failed. If evidence were at hand that at the close of

February 17 a balance of shares bought was undelivered and unpaid for, there would still be need to show that the sale of February 20 was made with the intent of intercepting the delivery and thereby obviating the payment. Normally a purchase in one clearance period is unaffected by a sale in a clearance period to follow. If exceptional circumstances may lead to another and exceptional result, the burden is on the People to bring the case within the exception. Settlements were due on the morning of Saturday, February 18, for transactions closed on February 17 or earlier. Settlements for later transactions were not due till February 23, for February 22, when they would naturally have been made, was a holiday and so excluded. If shares were sold on February 20, they would not be offset by the clearing house against purchases which had been made during an earlier period of clearance. To give them that effect, the first transaction would have to be kept open and delivery withheld until the time should arrive when it could be canceled by the second. The People concede that without such an extension of performance the later transaction was unavailing to neutralize the earlier. Not a syllable of evidence suggests that the purchase was still open. According to the custom of the Exchange, delivery and payment would have been made on February 18, when settlements were due for the term of clearance then expired. The People made no attempt to show that the custom was not followed. Both Pearsall and Maloney, the brokers from whom the shares were bought, took the stand upon the trial. There was a significant omission to inquire of them as to any departure from the normal practice. We cannot guess at such a departure to supply the elements of guilt.

Stress is laid by the People upon another line of proof that is yet to be considered. We do not underrate its significance as tending to show that the defendant's business was illegally conducted, with wanton disregard

[243 N. Y. 58]     Opinion, per CARDOZO, J.     [May,

of his duty to his customers. We cannot find, however, that it fills the open gaps in the proof of this specific crime. At weekly intervals or oftener the bookkeeper submitted a " position " sheet which showed to what extent the firm was " long " of stocks or " short " of them in transactions for its customers. From this statement one could see the stocks pledged with other brokers for money borrowed for the business, the stocks bought but not received, and the stocks sold but not delivered. A member of the firm would go over this sheet and indicate the shares which for the relief of the firm's finances there was need to sell or buy. Sales or purchases so made, as well as any other transactions for the account of the firm itself, were to be entered in one or other of four accounts under assumed or fictitious names. This practice began in October, 1921, when the firm was endeavoring without success to transfer to new lenders the loans which other brokers were calling and which it was unable to repay. In one of these fictitious accounts, the account of C. E. King, there is an entry on February 20 of the sale of 400 Mexican Petroleum, 200 at $120\frac{3}{4}$ and 200 at $120\frac{1}{4}$. Other sales of the same stock were made on the same day as legitimate transactions for the benefit of customers. There were sales to Pearsall & Maloney at prices different from those for " King," 100 at $123\frac{1}{4}$, 90 at $123\frac{1}{2}$, and 10 at $122\frac{7}{8}$. For anything the record shows, there may also have been sales to others. The prosecution asks us to infer that of the 400 sold for King, 200 were intended to neutralize the purchase during an earlier clearance period made for the account of Brunner.

We see no basis for such a holding. The inference is not difficult, in view of the purpose of the King account, that the sales of February 20 were unlawful, if not criminal. There is nothing to identify the crime, or fix its character and quality. We do not know how many shares of Mexican Petroleum the firm was carrying for customers. There may have been other customers besides Brunner

1926.]        Opinion, per CARDOZO, J.        [243 N. Y. 58]

trading in that stock. Indeed, evidence that there were may be found in the very fact that the sales for that day were at least 600 shares. Even if part of the aggregate for the day is to be allocated to Brunner and not to some one else, the transaction unexplained is a misappropriation or a larceny rather than an offset to a purchase which had seemingly been closed. The crucial difficulty remains that an order for a sale may not be held to be a trade against an order for a purchase in the absence of some evidence that the purchase was still open at the sale.

A misconception of the King account, revealed quite distinctly in the opinion of the court below, explains the varying conclusions in that court and in this. Analyzing that account, the Appellate Division pointed out that " King " was short of Mexican Petroleum when he sold on February 20, since his account does not show that he had bought the stock before. From the fact that " King " had not bought, there was a leap to the conclusion that the defendant had not bought. The " sale," therefore, was no sale, but merely a trade against an order. The trouble with this argument is that from the King account alone there is no method of determining the complete position of the firm in respect of this stock or any other. Let us assume, for example, that shares of Mexican Petroleum had been bought in due course, and that the firm, unable to carry the shares longer because of the calling of a loan, had determined to dispose of them without the order of the customer. A sale so made when entered under the name of King would figure as a short one in any statement of the King account. He was selling what he had not bought. This would not mean that what he sold had not been bought for some one else.

Neither in the King account nor elsewhere is there a basis for a finding that the purchase of February 17 was left unexecuted at the close of the appropriate period

of clearance, and, held over into a new period, was frustrated by a sale. For lack of such evidence, the conviction may not stand.

The judgments should be reversed and a new trial granted.

HISCOCK, Ch. J., POUND, MCLAUGHLIN, CRANE and LEHMAN, JJ., concur; ANDREWS, J., absent.

Judgments reversed, etc.