RED STAR TOWING & TRANSP. CO., Inc.,
v. THE RUSSELL NO. 7.

THE SEABOARD NO. 35.

No. 17541.

District Court, E. D. New York.

March 20, 1947.

Foley & Martin, of New York City (Christopher E. Heckman and Louis J. Lawrence, both of New York City, of counsel), for libellant.

Alexander & Ash, of New York City (Edward Ash, of New York City, of counsel), for claimant.

Macklin, Brown, Lenahan & Speer, of New York City (Gerald J. McKernan, of New York City, of counsel), for respondent-impleaded.

GALSTON, District Judge.

The Seaboard No. 35, loaded with ballast which was to be discharged at the dock of Tully & DiNapoli, Inc., respondent-impleaded, in Flushing Creek, had on June 7, 1945 been brought to that dock by a Russell tug. By that tug it was placed outside of the Radio, another scow. That berth was maintained until the night of June 8, when another Russell tug, which is the tug libelled in this action, arrived with the Fowler, another loaded scow. This scow was placed outside the Seaboard No. 35 and was made fast thereto. Up to that time, though in the interval the Seaboard No. 35 in low tide was on the ground, no damage had been done to the boat. After that, the Russell No. 7 pulled the Radio out from next to the dock, and the Seaboard No. 35 and the Fowler were "shoved" to the dock.

After pulling the Radio out, the captain on the Russell No. 7 told Maljers, the bargee, to get a line to the Tully & DiNapoli dock. Maljers in reply said: "You had better tie me up alongside of a light scow instead of alongside the dock; there ain't no water there for a heavy scow and at low tide I will be on the ground with this load". Maljers insisted on his position, refused to tie up to the dock, and a deck hand from the Russell No. 7 was sent to make the line fast to the dock, and Maljers then made the line fast on the scow's bitt, leaving, as he said, plenty of slack.

As the Radio went out, however, the Seaboard No. 35 and Fowler also swung out to the middle of the stream, but with the Seaboard No. 35 on the stern line to the dock, which had been put there by Bracco. The Russell No. 7 then pushed the Seaboard towards the dock, and Maljers put more lines out to secure his boat. During the night of June 8, Maljers, who had gone to his cabin, heard some noise from the hold, and on investigation found that the No. 35 was listing away from the dock at an angle of about 45 degrees. He also observed damage to the X braces. He said a couple of seams had started in the "scarphs there by the first section". The following morning

McMorrow, from the Red Star Barge Line, arrived in response to a telephone call from Maljers, and on arrival found the No. 35 with its stern about 10 feet from the dock, and the bow about 15 or 20 feet away. He believed it was the port side that was toward the dock. He too found the list was off shore.

The Russell tug had no instructions where to place the loaded scows when brought in. The custom was to bring them in and place them at an available berth.

The Tully & DiNapoli proofs disclosed that they did no night work, suspending at about 4:30 p. m. Bracco, the foreman at the Tully & DiNapoli dock, explained that when he arrived on the morning of June 8, he found the Seaboard No. 35 was the third out from the dock, in back of the Cleary No. 54, at that end of the dock closest to the Northern Boulevard bridge, i. e. the northern end of the dock. The Radio was unloaded on June 8, and after that the Cleary No. 54. When he suspended operations on June 8, on that afternoon the Seaboard No. 35 was still the third boat out from the dock. He said that the Seaboard No. 35 on the morning of the 8th had a bad list off shore, at an angle of about twenty-two or twenty-five degrees. Bracco testified that he put out a line from the stern of the Seaboard No. 35 that afternoon to the dock, at about 15 or 20 feet from the northerly end of the dock. Bracco also testified that he instructed the scow captain, after the inside boats were unloaded and taken out, that he was to pull the Seaboard No. 35 to the dock, and that the scowman replied that he would not pull it in because the water was too low. On June 9, when Bracco reported to work at 7:30 a. m., he found the Seaboard No. 35 was outside of two other ballast boats in the south tier, towards Roosevelt Avenue. That is not supported, and is contradicted. It was not until June 11 that the Seaboard No. 35 was unloaded. Previously, on June 9, the bargeman had complained that there had been damage done on his boat. After Bracco started unloading on June 11 there was no further list to the scow.

The loading had been heavy on the stern. He had brought the scow No. 35 in close to the dock on the morning of the 11th. There had been about seven hundred tons of ballast on the boat.

The crane operator at the dock corroborated Bracco with respect to the putting out of the line from the Seaboard No. 35 to the dock, and also to the effect that the Seaboard No. 35, on the afternoon of June 8, was at the north end of the dock, the third boat from the dock; and also with respect to the list of the Seaboard No. 35 on June 8. But he said that on the 9th the list was towards the dock. On the 11th, when about twenty buckets of ballast were taken off, the list disappeared.

 To succeed in this libel the burden is upon the libellant to prove negligence on the part of either or both the claimant and the respondent-impleaded. The libellant's position is that against the protest of the bargee of the Seaboard No. 35, the barge was shifted by the Russell No. 7 alongside the dock, and that in consequence at low water the scow rested on an uneven bottom of such character as to cause the specific damage which is complained of. The libellant encountered difficulty in proof of both propositions. No matter how detailed the scrutiny is of the available evidence in this case, it is impossible to determine from the conflict in testimony given by all of the parties, exactly where the tug No. 7 placed the Seaboard No. 35. This conflict exists not only when the testimony of one is compared with that of the others; but Maljers contradicts himself and is uncertain on this vital question. The same weakness was shown by Needham, the captain of the Russell No. 7. That the scow was alongside the dock with a line 15 feet in length from the stern to one of the bitts is the testimony of the bargee, but he was very vague in his recital of the position of his boat with respect to the north or south end of the Tully & DiNapoli dock at the time that the damage was sustained. In the absence of proof of that berth it is impossible to make a finding from his testimony or from the testimony of anybody else just exactly what that berth was. In consequence it is idle speculation to de-

termine what the nature was of the bottom on which the Seaboard No. 35 at that time rested. Taking Red Star Exhibit 2, which shows soundings along the Tully & DiNapoli dock as shown on a survey made July 13, 1945, it may be conceded that the survey shows an uneven bottom, but on what part of that bottom did the Seaboard No. 35 rest?

And whether an uneven bottom was the cause of the damage disclosed in the survey held of the vessel when it was placed in dry-dock, presents a problem in mechanics on which the experts disagree.

The survey of damage discloses a broken keelson in Bay 4, counting from the stern; one X brace in Bay 5 (from stern) crushed on top; fifth deck stringer from port side in Bay 6 crushed on under side by disturbed X brace; fifth deck beam from stern in Bay 4 crushed on the bottom; second deck stringer on port side crushed by X brace; deck beam in Bay 9 crushed by X brace, and deck stringer in Bay 9 crushed on bottom of X brace.

It is to be noted that there was no bottom damage. It is true that Hansen, a marine surveyor called by the libellant, testified that he had attended other surveys in which it appeared that keelsons had been broken as a result of grounding, with no damage to bottom planking. He said that that was possible because "there is more spring in a four inch plank than there is in a ten inch keelson". He also was of opinion that the damage from resting on a bottom could affect the underside of deck beams and deck stringers.

Another marine surveyor, Frank E. Bagger, also called by the libellant, was of the same opinion. He said, referring to the broken keelson, "The only cause for a keelson breaking in that way would be the fact that the scow rested on an uneven bottom which brought excessive pressure under that keelson. That may be the case of a high spot which brought local pressure; it might be the case of the scow being unevenly suspended, or resting on an uneven bottom in the middle, and the ends sagging, unsupported." He added that the stringer and X brace damage could also have been caused by the vessel lying on an uneven bottom. And this is a significant part of

the opinion: "As a matter of experience, I have found that the damage is more apt to show up in the deck stringers than in the keelsons; possibly because of the load on the deck."

Hansen and Bagger were called by the libellant in rebuttal of the testimony given by Aldridge, a marine surveyor called on behalf of Tully & DiNapoli. Aldridge had attended the survey on behalf of the Seaboard Great Lakes Corporation. He stated that he had examined the boat on drydock, and in that connection had gone over the bottom planks as well as the sides of the boat. He found no evidence of damage to the bottom planks, not even in the vicinity of the fifth keelson on the port side in Bay 4, nor any signs of leaking in the bottom, nor had the caulking been disturbed. Now the bottom planks were four inches in thickness. He was of opinion that the ten by ten keelson could not have broken unless the bottom planking had been damaged. He noted that the fifth keelson from the port side in Bay 4 would be between 21 and 23 feet from the port side. The interior construction of this scow was well illustrated in the model exhibited during the trial. While denying that the variegated interior structural damage could have been caused without damage to the bottom planks, Aldridge also expressed the opinion that a pressure due to improper loading on the deck of the boat could have been a competent and producing cause of the damage set forth in the survey. He was also asked whether the crushed deck beam and the deck stringer in Bay 9 could have had any possible connection with the damage to the fifth keelson in Bay 4 as a result of resting on the bottom, and he said "No" to that inquiry.

All in all in the absence of any scientific explanation of the principles involved as accounting for the specific damage listed in the survey, I accept the Aldridge opinion rather than the views of Hansen and Bagger. One of the additional reasons for favoring the Aldridge view is the absence of any damage to the bottom of the Seaboard No. 35. None of the surveyors discussed the mechanical principle of the resultant of opposing forces, in this case the bottom pressure and the pressure of the seven hun-

dred tons of cargo on the deck. Perhaps that principle is not involved. I am inclined to think it is.

The proof shows that the bottom at the Tully & DiNapoli dock was such that no boat prior to the occurrence involved in this libel had ever sustained bottom damage. Nor did the bargee in this case warn of any uneven bottom surface or hard bottom surface. His protest in effect amounted to no more than to assert that the No. 35, loaded, would go aground in low water. Certainly to conclude that a mere uneven mud bottom could have caused the damage is not sustained by the evidence. To find negligence here would lead to a speculation which was condemned in P. Sanford Ross, Inc., v. Moran Towing & Transportation Co., Inc., 2 Cir., 55 F.2d 1052; The Pride, 2 Cir., 135 F.2d 999.

█ The relative liabilities of wharfingers, consignees and tugs in respect to damages sustained by barges as a result of the nature of the bottom berths on which they are moored, were reviewed by Judge Augustus N. Hand in Waldie v. Steers Sand & Gravel Corporation, 2 Cir., 151 F.2d 129–131. All three classes are required to exercise "reasonable care". It would appear that the good reputation of a wharf may excuse a consignee and a tug, though not necessarily a wharfinger (in the instant case Tully & DiNapoli, Inc., was a consignee and lessee of the dock). Here it does not appear that the reputation of the bottom at the Tully & DiNapoli dock was other than good. And as for the tug, Judge Hand went on to say: "But a tug * * * must ply her trade all over the harbor, and there is ordinarily no warrant, either in principle or authority, for requiring her to sound at each wharf where she delivers a barge. She is indeed to be held for such information as is current in the calling; and if the wharf has a bad name, she should know it; that would be a factor in establishing her liability."

█ The burden of proof lying with the libellant in respect both to the explanation of the damage and the act or acts of negligence, I am unable to find that the libellant meets the test in either case. Accordingly the libel will be dismissed.

Concurrently with the filing of this opinion, appropriate findings of fact and conclusions of law will be filed.