**NEW YORK TRAP ROCK CORP.**
v.
**CITY OF NEW YORK.**
No. 19134.

United States District Court,
E. D. New York.
Aug. 21, 1953.

Hagen & Eidenbach, New York City (Nelson J. Johnson, New York City, of counsel), for libelant.

Denis M. Hurley, Corporation Counsel, New York City (Alfred T. Macre and Edwin M. Bourke, New York City, of counsel), for respondent.

ABRUZZO, District Judge.

Libelant as the owner of the scow De-Witt E. McKinstry instituted this suit in Admiralty to recover from the City of New York damages sustained to the scow by reason of an alleged unsafe berth at the New York City Asphalt Plant at Flushing Creek, Flushing, New York.

On October 18, 1948, the scow loaded with 615 cubic yards of screenings (approximately 800 tons) left Tompkins Cove, New York, bound for the New York City Asphalt Plant at the mouth of Flushing Creek. The City of New York was consignee of the cargo. The scow was towed down the North River and arrived at the asphalt plant about 10 a. m. on October 20th.

The captain of the scow testified that when he left Tompkins Cove he had one inch of water in his boat and had the same amount when he arrived at the asphalt plant. At the time of arrival it was drawing 9½ feet of water. After arrival she was placed outside of a loaded sand scow which was against the dock. No work was performed on the McKinstry on the 21st. On the 22d at about 4 p. m., the captain went ashore to obtain provisions, and when he returned at about 6 p. m. he found that his scow had been moved farther down the river, port side against the dock. He went to bed at 7 p. m. and at that time he had his lines out from the scow to the dock and they were slack. At about 9:30 p. m. he was awakened to find that his scow was listing about 35 degrees off shore to starboard and he was unable to get to the dock at that time because of the list. On Saturday, October 23d, about 120 tons of cargo was removed. He examined the scow and found that she had a big "twist" in her, was leaking, and he pumped the water out of the scow. He reported the damage to Mr. Kennedy, the plant superintendent employed by the City of New York, and then telephoned his office. On Monday morning, October 25th, the scow was unloaded and moved down the dock about one length.

Marcus, a Marine inspector employed by libelant, testified that he arrived at the asphalt plant on the 25th after the scow had been unloaded and saw the boat "twisted" and laying alongside of the dock. At about 5 p. m. at high tide he took soundings with a manilla rope that he had measured and to which he tied ribbons every 5 feet. He found 13 feet of water at the port bow corner, 16 feet at the port stern quarter, 18 feet at the starboard stern corner, but could not reach the starboard bow corner because the boat had shifted away from the berth.

An engineer and tide expert with the Corps of Engineers, United States Engineers Office, testified that the difference in the tide between low and high water was 8½ feet.

Libelant's loading foreman testified that he examined the scow prior to and after she was loaded but found no twist and that she was seaworthy, fit to tow, and "fitly" trimmed.

Schneckenberg, the asphalt foreman at respondent's New York City Asphalt Plant, testified that he shifted the scow

at 11:15 a. m. on October 22d. Just prior to the shifting he went aboard to notify the captain that he was going to shift the scow into the dock but there was no one aboard and he went ahead and shifted her. After the shifting he supervised the unloading. His men worked to 3 o'clock that day and removed about 160 cubic yards. On October 23d his men worked from 7 a. m. to 3 p. m. and removed all but approximately 50 cubic yards. She was completely unloaded on Monday, October 24th at 9 a. m. At no time while they were removing the screenings did he see the captain aboard the boat. At about 11 or 11:30 a. m. on the 25th he was advised by Kennedy, the foreman in charge of the plant (since deceased), that the captain of the scow had complained that the barge had a twist in it. He accompanied Kennedy to the scow and spoke to the captain who informed him that the barge had a twist but had had a worse twist before, that it was kind of weak, and "that they loaded it so to try to take the twist out of it." This witness contradicted the testimony of the scow captain as to the location where the scow was lying after she was shifted to the dock and where she was unloaded. The captain had marked a photograph with two X's (Respondent's Exhibit B) but this witness marked a different photograph with two X's and an S (Respondent's Exhibit D) at a different location. The photograph of the part of the dock identified by this witness as being the location at which the scow was unloaded shows hoppers into which he claimed the screenings were unloaded. The one identified by the captain did not show the hoppers. Schneckenberg also testified that he never saw any scows aground at the dock.

McGowan, an engineer in the Office of the President of the Borough of Queens, testified that the dock at the asphalt plant was dredged in March, 1947, and that the bottom was composed of a semifluid material. Soundings were made on November 8th by using a sounding rope which had red, white, and blue markings every 5 feet and white intermediate foot markings. He and another man stood on the dock holding the range line and measured the distance from the top of the dock to the surface of the water. Then he measured from the surface of the water to the bottom while three men in a row boat called out the measurements to him. At low tide the measurement of the dock at the hoppers according to this witness was 9½ feet. He stated that 2 feet from the dock was a berne which he described as a slope of the earth toward the dock and that the bottom was uneven alongside the face of the dock but he claimed that every dock had a similar bottom.

The expert witnesses for both parties disagree as to the depth of the water at low tide. The testimony of libelant's experts by mathematical calculations fixes the depth at various spots at from 4.7 feet to 9.7 feet, while that of the respondent's expert fixes it at approximately 9½ feet.

The barge, when it arrived at the asphalt plant, was drawing 9½ feet of water. Assuming the respondent's figure of 9½ feet is correct and the barge was drawing 9½ feet of water fully loaded, it would necessarily be grounded to some extent. From this proof I am convinced that there was not 9½ feet of water at low tide but less, and that the failure by the respondent to provide a berth with enough water caused this damage. This conclusion is amply borne out by the further fact that the respondent's expert in measuring the dock at the hoppers at 9½ feet admitted that 2 feet from the dock was a berne which he described as a slope of the earth toward the dock, and that the bottom was uneven alongside the face of the dock. This berne would create a condition of less water at low tide.

I believe the testimony of the captain of the barge. I do not believe the testimony introduced by the respondent.

The respondent cites only one case in support of its legal position, Red Star Towing & Transp. Co. v. The Russell No. 7, D.C.E.D.N.Y., 70 F.Supp. 713. This particular case is not in point. A decree was made by the lower court dismissing the libel as to Tully & DiNapoli, Inc., consignees, and a decree in favor of the tug Russell No. 7 which towed the barge to what was claimed to be a shallow berth. This decree was affirmed by the Circuit Court of Appeals in a divided decision. That case is distinguishable for the reason that the tug Russell No. 7 was held not to be responsible for towing a barge to a shallow berth in view of the fact that no proof was offered that the tug Russell No. 7 knew that this berth was dangerous and, as to Tully & DiNapoli, Inc., consignees, the court ruled that there was no proof that the libelant's scow was moored by them and with their assistance to a shallow berth.

In the case at bar, the dock was owned by the respondent. The barge was moored by the respondent and placed in a shallow berth and in that respect is quite different from the Red Star Towing & Transp. Co. case.

The facts in The Zeller No. 14, D.C.E.D.N.Y., 74 F.Supp. 538, are more comparable to those at issue in the instant case. The respondent had a legal duty when it assumed to berth libelant's barge to choose one with sufficient water. The berth and the mooring of the barge were under its exclusive control. The Thomas Quigley, 2 Cir., 130 F. 336; The Eastchester, 2 Cir., 20 F.2d 357. The Thomas Quigley case is ample authority for the legal conclusion that the respondent is responsible for maintaining a dangerous mooring place for doing business at its wharf, the bottom being uneven and the water, at low tide, insufficient for loaded boats to lie there with safety.

The libelant is entitled to a decree.

Submit findings of fact, conclusions of law, and a decree in accordance with this opinion.