## THE ZELLER NO. 14.

### ZELLER MARINE CORPORATION v. LEHIGH VALLEY R. CO. et al.

#### No. 17140.

District Court, E. D. New York.
July 1, 1947.

---

Foley & Martin, of New York City (Louis J. Lawrence, of New York City, of counsel), for Zeller Marine Corporation, libelant.

Pyne & Lynch, of New York City (Warner Pyne, of New York City, of counsel), for Lehigh Valley R. Co.

J. Vincent Keogh, U. S. Atty., of Brooklyn, N. Y. (Leo J. Curran, Asst. U. S. Atty., of Brooklyn, N.Y., of counsel), for the United States.

Duncan & Mount, of New York City (Frank A. Bull and Daniel Huttenbrauck, both of New York City, of counsel), for Bethlehem Steel Co.

ABRUZZO, District Judge.

This is a suit in Admiralty which was originally commenced against the respondent, Lehigh Valley Railroad Company, by the owners of the barge "Zeller No. 14" for damages to the barge while in the hands of the respondent, Lehigh Valley Railroad Company, due to a charter party. The Lehigh Valley Railroad Company chartered this barge and had continuous possession from August 13, 1943, until June 15, 1944. It was returned to the libelant in damaged condition by the respondent, Lehigh Valley Railroad Company.

The libelant claims that it is entitled to recover for its damages by reason of its charter which amounted to a demise, respondent agreeing to return the barge in the same condition, ordinary wear and tear excepted. Because the barge was tight, staunch, and seaworthy when originally delivered to the respondent, Lehigh Valley Railroad Company, and returned in a damaged condition, the libelant is, therefore, entitled to damages against the Lehigh Valley Railroad Company. I so find. The Lehigh Valley Railroad Company under its charter party is responsible to the libelant for these damages.

The respondent, Lehigh Valley Railroad Company impleaded the United States, alleging that the damage to the barge was caused by reason of a foul berth at the United States Army Salvage Depot, Brooklyn, New York; that the berth was occupied and used by the United States for the sale, shipment, and delivery of scrap iron; and that the damage was caused by the negligence of the United States which controlled this Army Salvage Depot.

The United States impleaded the Bethlehem Steel Company, alleging that the barge was at its berth in this Salvage Depot to receive a cargo of scrap iron which had been sold by the United States to Bethlehem Steel Company under a contract by which Bethlehem Steel Company agreed to assume all risks in connection with the loading of the barge by the United States and, if the United States should be liable, Bethlehem Steel Company under such contract would be obligated to indemnify it. It is necessary to determine first whether the respondent, Lehigh Valley Railroad Company, has sustained its claim of liability against the United States.

This particular claim is founded on evidence which the Lehigh Valley Railroad Company claims clearly establishes the following facts: (1) That the berth at this Depot where the "Zeller No. 14" was placed to be loaded was an unsafe and dangerous one, because the water was too shallow to float this barge so that she rested on the bottom, even when only slightly loaded, due

to the fact that the bottom was hard either from scrap material which had been dropped overboard or rock, or both, thus causing the bottom to be irregular and uneven; (2) that the United States government employee designated the exact place where the "Zeller No. 14" was placed for loading; (3) that the "Zeller No. 14" was damaged on June 6, 1944, while lying on the bottom in the berth where she had been so placed by a government employee for loading; (4) that the United States as lessee had possession of and controlled the berth where the "Zeller No. 14" was placed; and (5) that the "Zeller No. 14" was placed in the berth where she was damaged June 6, 1944, for the purpose of receiving a cargo of scrap iron which was the subject of the contract of sale from the Government to the Bethlehem Steel Company.

The proof establishes and there seems to be no dispute as to the contentions contained in subdivisions 3, 4, and 5. There is proof in support of the contention contained in subdivision 2. On May 31, 1944, the Lehigh Valley Railroad Company's tug "Aurora" towed the barge "Zeller No. 14" to this United States Army Depot. Upon arrival there at 6:30 p.m., the "Zeller No. 14" was left at a place where a uniformed watchman at the Depot instructed that she be moored. The captain of the "Aurora" testified that many times previously when arriving at this Depot he was always instructed by the watchman at the Depot where to place his barge. The "Zeller No. 14" was towed there to receive a cargo of scrap material which was sold by the United States Government to the Bethlehem Steel Company. The Government employed a tug to shift barges in and out of the loading berths, and it is not in dispute that the Government was in entire charge of the yard operations.

It remains to be determined whether the respondent, Lehigh Valley Railroad Company, has sustained the burden of proof cast upon it with respect to the claims contained in subdivision 1.

Two Lehigh Valley Railroad Company employees, Richard and Sager, arrived at the Salvage Depot on June 6, 1944, at noontime to give assistance to Lehigh Valley Railroad Company barge "No. 128" which was in trouble. They noticed the "Zeller No. 14" was loaded with a light cargo of scrap metal which was evenly distributed. The "Zeller No. 14" lay in the berth as shown on Lehigh Valley Railroad Company's Exhibits 3 and 5. Her starboard side was close to the bulkhead and she was listed to port 18 to 20 feet. The witness Richard with a pike pole sounded along the entire starboard side of the "Zeller No. 14" and along her bow end, and when he struck bottom it sounded as though there was something hard there, like steel or stone. Sager who was with him could tell from the sound when the pole struck the bottom that it was striking something hard. The greatest depth of water noted was found to be not more than three feet. Richard returned to the Salvage Depot a week later on June 13th, at which time three men representing dredging contractors were taking soundings. Richard saw a crane with a bucket digging down in the water which picked up automobile chassis, motor parts, tractor treads, parts of war tanks, and different "stuff" like scrap iron. There is evidence from a witness, Dworschak, present on that date that "the bottom was very rough because we snagged our disc in some material on the bottom and it was necessary to ask the assistance of a truck on the bulkhead to pull it out for us." It could not be released by hand. There is ample proof that the "Zeller No. 14" lay in a berth in insufficient water which made it unsafe and dangerous and, therefore, clearly indicates negligence on the part of the United States Government.

■■ These facts were not to any great extent controverted by the United States Government, which amply corroborates the findings of carelessness or negligence on the part of the United States Government. The Government owed the respondent, Lehigh Valley Railroad Company, the duty of providing a reasonably safe berth for the loading of its barges. This finding of factual negligence on the part of the Government necessitates a perusal of the claim which the Government makes against the Bethlehem Steel Company as to whether or not the Bethlehem Steel Company is responsible to the Government by reason of a claim of contractual obligation to assume

all risks in connection with the loading of the barge, and whether or not there is an agreement by Bethlehem Steel Company to indemnify the Government for any damage which it sustained in the loading of the barge "Zeller No. 14."

The clause of the Government's contract with Bethlehem Steel Company on which the Government bases its claim reads as follows:

"Material sold hereunder will be removed within ten (10) days from notification of award, and payment in full must be made prior to removal of the material. All property purchased hereunder will be loaded by the government onto means of transportation furnished by the Contractor; however, the Government will not be liable for any damage resulting therefrom, and the Contractor agrees that the Government shall have no liability in connection therewith."

It is the construction of this particular clause on which the Government's claim for indemnity must stand or fall. The reported cases are all contrary to the Government's contention. In the case of Southern Bell Tel. & Tel. Co. v. Mayor and Bd. of Alderman, 5 Cir., 74 F.2d 983, 984, 985, it was held:

"It is well settled that a contract of indemnity will not be construed to indemnify the indemnitee against losses resulting to him through his own negligent acts, where such intention is not expressed in unequivocal terms. * * *"

This was also expounded in Sinclair Prairie Oil Co. v. Thornley, 10 Cir., 127 F.2d 128, 133:

"An indemnity contract will not be construed as indemnifying one against his own negligence unless such a construction is required by clear and explicit language of the contract. Doughnut Mach. Corp. v. Bibbey, 1 Cir., 65 F.2d 634; North American Ry. Const. Co. v. Cincinnati Traction Co., 7 Cir, 172 F. 214; Thompson-Starrett Co., Inc., v. Otis Elevator Co., 271 N.Y. 36, 2 N.E.2d 35."

It is academic that the language of indemnity must be clear and concise, and there is nothing contained in the language of this contract which even remotely covers the cause of the damage to this barge, to wit, an unsafe berth. The clause relates and refers to non-liability by the Government resulting from the loading. The loading of this barge did not even remotely cause the damage.

I find that the Bethlehem Steel Company is not liable to the Government.

A decree, finding of facts and conclusions of law may be entered in accordance with this opinion.