**SUTRO BROS. & CO., Plaintiff,**
v.
**INDEMNITY INSURANCE COMPANY OF NORTH AMERICA, Defendant.**
No. 62 Civ. 2606.

United States District Court
S. D. New York.
Feb. 9, 1967.

Sullivan & Cromwell, New York City, for plaintiff, Marvin Schwartz, John F. Cannon, New York City, of counsel.

Bigham, Englar, Jones & Houston for defendant, Alfred J. Morgan, Jr., Robert B. Budelman, Jr., New York City, of counsel.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW.

LEVET, District Judge.

In this action, plaintiff, Sutro Bros. & Co. (hereinafter "Sutro"), a stockbrokerage partnership, seeks recovery from its insurer, defendant Indemnity Insurance Company of North America (hereinafter "Insurance Company") for losses said to be $1,261,343.91 allegedly sustained by plaintiff through the larceny of a customer. The contract upon which plaintiff sues is a bond, "Brokers' Blanket Bond Form No. 14," which provides that defendant is to indemnify plaintiff and hold plaintiff harmless from and against "Any loss of Property (occurring with or without negligence) through * * * common law or statutory larceny * * * while the Property is in transit anywhere."

Jurisdiction is based upon diversity of citizenship.

This action was commenced on July 9, 1962 in the Supreme Court of the State of New York, County of New York, by service of the summons and complaint. On July 27, 1962 defendant removed the action to this court by filing a Petition for Removal in the New York County Supreme Court.

The losses which plaintiff sustained occurred under circumstances, more fully described herein, when checks given by plaintiff's customer Arlee Associates, Inc. (hereinafter "Arlee") to settle balances due on orders for purchases of securities proved to be uncollectible. Plaintiff contends that these losses are covered by Insuring Clause C of defendant's bond, entitled, "In Transit," on the theory that the stock certificates which plaintiff delivered to Arlee to fill said purchase orders were removed from plaintiff's "possession, custody and control" by reason of "larceny, theft, fraud and wrongful abstraction" while the certificates were "in transit."

On the other hand, defendant contends that said loss is not covered by the bond because, as a matter of fact (1) no loss of property occurred by statutory or common-law larceny while the property was "in transit" and (2) because plaintiff's loss resulted from risks expressly excluded from coverage, to wit, "trading" and extensions of credit.

The case was tried by the court without a jury.

After taking the evidence submitted by the parties, examining the exhibits, the pleadings, the briefs and Proposed Findings of Fact and Conclusions of Law submitted by counsel, and after hearing oral argument, this court makes the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. Plaintiff is a co-partnership dealing in stocks, bonds and other securities, as broker and otherwise, with its principal office at 80 Pine Street, New York, New York. All of the partners of plaintiff are citizens of the State of New York or of states other than the Commonwealth of Pennsylvania.

2. Defendant, Insurance Company, is a citizen and resident of the Commonwealth of Pennsylvania.

3. On or about October 28, 1958, defendant, for valuable consideration, duly executed and delivered to plaintiff an agreement of insurance entitled, "Brokers' Blanket Bond Form No. 14" and bearing the designation, "S–50732–B." (Ex. 1) The bond was drawn in its entirety by defendant without any collaboration in its preparation by plaintiff. At all relevant times the bond was in full force and effect to an amount not exceeding $1,500,000.00.

4. (a) The bond covered, among other losses:

"(C) Any loss of Property (occurring with or without negligence) through robbery, common-law or statutory larceny, embezzlement, misappropriation, theft, holdup, misplacement, mysterious unexplainable disappearance, being lost or otherwise made away with, damage thereto or destruction thereof, and any loss of subscription, conversion, redemption or deposit privileges through the misplacement or loss of Property, while the Property is in transit anywhere in the custody of any person acting as messenger or in the custody of any armored motor vehicle company, except while in the mail and while being transported by express or as freight after receipt of the Property by a carrier for hire other than an armored motor vehicle company, such transit to begin immediately upon receipt of such Property by the transporting person or company, and to end immediately upon delivery thereof at destination." (Ex. 1, p. Two)

(b) Section 1 of the bond (Ex. 1) provides that this bond does not cover:

"(d) Any loss the result of any loan made by the Insured or by any of the Employees, whether authorized or unauthorized, except when covered under Insurance Clause (A), (D) or (E) hereof."

(c) By reason of an amendment contained in Section 13 of the agreement (Ex. 1), subsection (e) of Section 1 excludes from coverage:

"(e) Any loss resulting directly or indirectly from trading, with or without the knowledge of the Insured, in the name of the Insured or otherwise, whether or not represented by any indebtedness or balance shown to be due the Insured on any customer's account, actual or fictitious, except when covered under Insuring Clause (A), (D) or (E)."

5. One Harold Friedman was a partner in Sutro between July 1, 1945 and up to the time of his resignation on January 2, 1962. (Friedman deposition, Ex. 5, p. 4) In the period between May, 1961 and September, 1961 (and apparently from 1950), he was the managing partner at the main office of Sutro at 80 Pine Street, New York City. (Ibid p. 6) The record-keeping and financing of Sutro were done from the main office where there was an order room department, a purchase and sales department, an IBM department, a margin department, a bookkeeping department, administration and file rooms. Friedman was in general charge of each department. (Ibid pp. 7, 8)

6. On or about August 25, 1960, a cash trading account for the purchase and sale of securities was opened with plaintiff by Arlee. The officers of said corporation then, and during the period here concerned, were Leo Sinsheimer, President, Joyce Sinsheimer, Vice President, and Arthur Katz, Secretary. The address of Arlee was 55 Liberty Street, Room 703, New York, New York. Katz and Sinsheimer made the major decisions of Arlee. (Exhibits 6 and 7; Katz dep., Ex. 4, pp. 3, 5) Leo Sinsheimer and Arthur Katz, directly or indirectly, were also the sole stockholders of Arlee.

7. (a) Katz and Sinsheimer, through various corporations at various times, opened trading accounts with Sutro as follows: (1) First Discount Corporation on May 5, 1958, January 21, 1959 and June 10, 1959 (Friedman dep., Ex. 5, p. 15); (2) First Industries, Inc. on November 14, 1958 (Friedman dep., Ex. 5, p. 13) and (3) Market Financial Corporation at a later date.

(b) The business of the First Discount Corporation was that of a lending company engaged primarily in the lending of money on collateral of securities of companies either traded on the various listed Exchanges or over-the-counter, such loans being made to owners of the stocks. The company also made "clearance"

loans.[1] First Discount Corporation charged a fee for this, a source of income. The rates varied from 6% to as high as 15% per annum based on the type of security involved, the rate of advance, the amount of margin, etc. (Katz testimony before SEC, Ex. C, February 19, 1962, pp. 2361, 2362, 2364)

(c) Friedman, plaintiff's managing partner, agreed with Katz that securities could be delivered to First Discount Corporation against uncertified checks up to a daily limit of $10,000 and Friedman also allowed split deliveries on at least one occasion; part of the securities were delivered and paid for on one day, the rest were delivered and paid for the following day. (Katz testimony before SEC, Ex. C, February 19, 1962, pp. 2366, 2367; Friedman dep., Ex. 5, pp. 34, 35, 36)

(d) Later, in May 1960, when Katz and Sinsheimer had an account with Sutro in the name of First Industries, Inc., Friedman advised Katz that Sutro would no longer accept orders for First Industries, Inc. or First Discount Corporation, saying that the New York Stock Exchange had required him to stop doing business with these corporations because they were factors. (Katz testimony before SEC, Ex. C, February 19, 1962, pp. 2368-68A) A new account was then opened in the name of Market Financial Corporation in late May or perhaps June of 1960, which became relatively inactive after the summer of 1960, when the Arlee account was opened. (Katz testimony before SEC, Ex. C, February 19, 1962, pp. 2369, 2370)

8. Friedman, managing partner in Sutro, knew that prior to the Arlee account Katz was in the financing and factoring business through First Discount Corporation, First Industries, Inc.

and Market Financial Corporation, and Katz discussed this with Friedman many times. (Katz testimony before SEC, Ex. C, June 27, 1961, p. 252) By 1959, Friedman apparently knew about the nature of the business theretofore conducted by Katz and Sinsheimer. (Friedman dep., Ex. 5, p. 45)

9. In general, the methods of operation of Arlee and Sutro were as follows: Arlee ordered stock purchased through Sutro as broker; Sutro confirmed the purchases; Sutro delivered the stock certificates as hereinafter delineated. (Findings 10 through 15, inclusive) These securities would be delivered by Arlee to various other brokers against sale; in some instances the securities were sold within a day after purchase; Arlee then took certified checks on New York banks for these sales, deposited these checks and later gave Sutro uncertified checks in payment. (Katz, Ex. C, June 26, 1961, p. 107; Katz dep., Ex. 4, pp. 21-25)

10. During the period between May 12 and May 19, 1961, each purchase for the account of Arlee was confirmed on the day the order was executed by the mailing to Arlee of a printed standard form of confirmation. (Ex. 2, par. 5 and Attachment 2) The confirmation form, containing the terms of each purchase, required checks in payment of purchases to be in plaintiff's possession by the settlement date. Certain provisions of said form were as follows:

"Checks in payment of purchases, payable to Sutro Bros. & Co., or securities sold and held by you, after properly endorsing same, should be sent either to our branch or main office and should be in our possession by settlement date in order to comply with current rules and regulations."

1. Factors extend credit of two types: (1) Under a conventional collateral loan wherein the factor generally advances for the customer an agreed percentage of the purchase price against the collateral of the securities being purchased; (2) a so-called "clearance" loan or transaction wherein the borrower does not put up any margin at all but purchases and almost immediately sells the same security, usually within four business days, the factor usually not advancing any funds until both the "buy" and "sell" orders have been executed. (Ex. C of Sutro Bros. & Co., SEC Exchange Act Release No. 7052 at 5-6)

\* \* \* \* \* \*

"(2) If this is a purchase (a) interest will be charged on any amount not paid on the settlement date, and (b) pending payment in full, the securities may be hypothecated, separately or commingled with other customers' securities, for the amount due thereon or, if so commingled, for a greater amount." (Ex. 2, par. 5 and Attachment 2)

11. After the opening of the Arlee account, Katz requested Friedman by telephone for permission to obtain $25,000 per day in securities against uncertified checks, to which I find that Friedman assented. (See Katz testimony before SEC, Ex. C, February 19, 1962, pp. 2370–71) Later, at the request of Katz, this was increased to $50,000 per day. (See testimony of Katz before SEC, Ex. C, June 26, 1961, pp. 100, 101; June 27, 1961, pp. 255, 257; Katz dep., Ex. 4, pp. 40–44)[2]

12. In the period between May 12, 1961 and May 25, 1961, on the days that securities were to be delivered to Arlee, plaintiff's messenger would arrive at Arlee's 55 Liberty Street office between the hours of 10:30 A.M. and 11:30 A.M. with certificates, in bearer form, representing the securities purchased. The messenger handed the certificates to an officer or employee of Arlee and presented a delivery bill and receipt form covering the purchase. Arlee stamped the delivery bill to indicate receipt of the certificates (subject to count and examination) and returned to plaintiff's messenger the receipt form. (Ex. 2, par. 6 and Attachment 3; see Finding 13; see also Katz dep., Ex. 4, pp. 9, 10, 11; Friedman dep., Ex. 5, pp. 27–29)

13. This receipt itemized the securities and provided as follows:

"Receipt is hereby acknowledged of the described securities which Sutro Bros. & Co. have declared to us in advance of payment therefor, solely for the purpose of enabling us to inspect and verify the same. Title thereto passes to us only against receipt by Sutro Bros. & Co. of payment therefor, but all risks to such securities, including risk of loss, are assumed by the undersigned." (Ex. 2, par. 6 and Attachment 3; see also Katz dep., Ex. 4, p. 12)

This so-called "receipt" (Ex. 2) thus provided that title to the securities delivered "passes to us [i.e., Arlee] only against receipt by Sutro Bros. & Co. of payment therefor." Actually, Arlee already had title.

14. On the afternoon of the same day the messenger would return to Arlee's office between the hours of 3:00 P.M. and 4:00 P.M., surrender the receipt which he had received that morning when he delivered the certificates, and receive from Arlee the delivery bill and a check for the purchase price. (Ex. 2, par. 7) The head runner of Sutro passed the checks to the cashier for verification and deposit. (Friedman dep., Ex. 5, p. 31)

15. Sutro delivered whatever securities Arlee ordered. According to Katz, Sutro took Arlee's checks and didn't deposit them the day they were received. (Katz testimony before SEC, Ex. C, June 26, 1961, p. 110) The time lag between the clearance of a check received by Arlee on a New York bank and the clearance of a check which it gave Sutro on a similar or out-of-town bank was about 24 to 48 hours. (Katz dep., Ex. 4, p. 26)

16. In the spring of 1961, Arlee maintained bank accounts in the Perth Amboy National Bank, New Jersey, Meadowbrook National Bank, New York, National Bank of Westchester and the New Jersey Trust Company and checks of Arlee drawn on these banks were given to Sutro. Arlee, in turn, received payment from other brokers by checks on New York City banks, sometimes on the very day Arlee delivered the certificates. (Katz dep., Ex. 4, pp. 25–26)

17. From approximately May 12, 1961 to May 19, 1961, Arlee purchased from

2. I have not overlooked Friedman's testimony, but in view of all the facts and circumstances (see Findings 7, 8, 14, 19, 22(g)) I have little confidence in his testimony on those points.

Sutro securities having an aggregate purchase price of $1,392,595.99. (See Ex. A) These were delivered on May 18, 22, 23, 24, and 25, 1961. (Ex. 2, attachment 1, pp. 21–24) The messenger did not obtain certification of any checks received for these certificates. (Katz dep., Ex. 4, pp. 41–44; Ex. B, p. 2)

18. From the time the Arlee account was opened in August 1960 to the end of May 1961, plaintiff, as stockbroker for Arlee, executed approximately 950 purchase orders for securities valued at about $13,400,000. During this period of time almost all of the transactions in the account were purchases of securities. Sales of securities were comparatively few. (Ex. C, Sutro Bros. & Co., SEC Exchange Act Release No. 7052, at 7; Ex. 4, p. 49) Up to May 18, 1961, Arlee paid for all purchases; its checks were honored.

19. Plaintiff accepted as payment from Arlee for the execution of the aforesaid 950 purchase orders 838 checks, not one of which was certified. Of said 838 uncertified checks, plaintiff deposited and collected 771 checks but the last 67 checks, totaling $1,392,595.99, which were accepted by plaintiff on and between May 18, 1961 and May 25, 1961, for the deliveries described in Finding No. 17, "bounced" because of instructions by Arlee to the drawee bank to stop payment. Of the 67 checks, 16 checks, totaling $271,297.66, were not signed by Arlee as drawer. These 16 checks later were replaced by signed checks dated May 23, 1961 on which payment was subsequently stopped. (Ex. 2, Attachment 1) Four of the 67 checks, totaling $133,246.93, were subsequently paid. It was stipulated by the parties at trial that the net loss sustained by plaintiff was $1,137,775.54. (M. 1)

20. It appears by stipulation of the parties (Ex. 3 and Ex. A attached to such stipulation) that between May 12, 1961 and May 25, 1961 the daily balance of Arlee at the Perth Amboy National Bank was insufficient to meet the checks drawn by Arlee on each day, to wit, May 12, 15, 16, 17, 18, 19, 22, 23, 24 and 25. Katz conceded that in May 1961 Arlee had no assets other than the securities it had purchased (Katz dep., Ex. 4, p. 29) and that in May 1961 Arlee, by Sinsheimer, instructed the Perth Amboy National Bank not to pay certain checks which it had given to Sutro in connection with the purchase of securities since there were inadequate funds (in that bank) to pay such checks. (Katz dep., Ex. 4, p. 31) From August 1960 to the middle of May 1961 all checks of Arlee had been paid when presented. (Katz dep., Ex. 4, pp. 47–48)

21. For the reasons hereinafter stated, I find that plaintiff has not proved by a fair preponderance of the credible evidence that when, or before, Arlee received the securities from Sutro, Arlee intended to steal the certificates.

(a) Katz testified that in the period prior to May 15, 1961, there was no intention to defraud Sutro and that the purchases were made in good faith (Katz dep., Ex. 4, p. 48) and that as to the period subsequent to May 15, 1961, there was no time when they wanted to, attempted to, or even considered defrauding anyone. (Ibid, p. 49) Katz also testified that at the time the checks were issued by Arlee and delivered to Sutro's messenger, on which payment was thereafter stopped, it was Arlee's intention that these checks be paid just as all prior checks had been paid, and that it was not his intention to steal the certificates. (Ibid, pp. 55–56) He said that the issuance of checks without signatures on May 18, 1961 was an honest mistake. (Katz testimony before SEC, Ex. C, June 26, 1961, p. 115)

(b) On or about July 25, 1961, Arthur Katz, Secretary, and Leo Sinsheimer, President of Arlee, were indicted for theft by means of false and fraudulent representations and pretenses made by them to Sutro on May 22, May 23, May 24 and May 25, 1961 (see Counts First, Second, Third and Fourth of indictment), and on the same date, on other counts, for uttering checks with the intent to defraud, drawn upon a bank for the pay-

ment of money, knowing at the time of such making, etc. that the maker (i. e., Arlee) had insufficient funds and credits, the offenses alleged to have been committed on May 23, May 24 and May 25, 1961 (see Counts Fifth through Forty-Eighth of indictment). (See Indictment, Exs. 8 and 8A) On or about February 13, 1962, Katz and Sinsheimer, then represented by counsel, pleaded guilty to grand larceny in the First, Third and Fourth counts in said indictment. (Ex. X) [3] The first count alleges a theft by means of a false and fraudulent representation on May 22, 1961 that "defendants" had insufficient funds in the Perth Amboy National Bank to pay certain debts. The proof in this case, even if sufficient to sustain the indictment count, does not support the claims of plaintiff asserted in this action. The third and fourth count claims are subject to similar comment.

There is nothing in the indictment and, hence, nothing in the pleas of guilty which demonstrates anything constituting a fraud upon Sutro *before delivery*. Instead, both indictment and plea indicate a claim of fraud in respect to checks drawn on the Perth Amboy National Bank after the certificates had already been delivered to Arlee.

(c) Although both Katz and Sinsheimer, at the time of the plea (February 13, 1962) told the presiding judge that each, with intent to deprive Sutro of certain stock and bonds, made false and fraudulent representations as to funds and credit with the Perth Amboy National Bank (see Ex. X, pp. 4–6), there is no independent proof that such representations were made at the time of or before the delivery of the securities.[4] These state-

ments, moreover, were made ex parte as to the defendant here.

(d) On April 11, 1963, both Katz and Sinsheimer were sentenced by the state court to confinement for not less than one year and three months and not more than two years and six months. (Ex. Y) [5] On July 19, 1963, when again represented by counsel, each sentence was modified to not less than one year and three months and not more than two years on each count, the sentences all to run concurrently. (Ex. Z) [6]

(e) Katz testified in his deposition before trial that he pleaded guilty because of the advice of counsel and his financial inability to defend the case. (Katz dep., Ex. 4, May 12, 1964, p. 56)

22. I find that plaintiff, Sutro, has not proved by a fair preponderance of the credible evidence that it (1) did not know the extent of the Arlee purchases of securities; or (2) that it was ignorant of the fact that these securities purchased by Arlee through it were being sold and that the checks in payment to Sutro came from these sales of such securities. The plaintiff has failed to prove by a fair preponderance of the credible evidence that it was not cognizant of Arlee's method and time of sale of the certificates purchased from Sutro:

(a) Friedman said that Sutro made no credit investigation as to Arlee and that he was not concerned about the credit standing of "these people" (referring to Arlee) (Ex. 5, pp. 31, 32, 33);

(b) The stocks were delivered to Arlee in "street name," i. e., in the name of the brokerage house, as a matter of trade custom, in order to make deliveries on time. (Ex. 5, p. 26; Wyckoff, Dictionary of Stock Market Terms, p. 216 (1964))

"A purchase of property by means of a false pretense is not criminal, where the false pretense relates to the purchaser's means or ability to pay, unless the pretense is made in writing and signed by the party to be charged."

3. On December 8, 1966, at the request of the court and by consent of counsel, Exhibits 8A, X, Y and Z were admitted into evidence.

4. It may be noted that Section 947 of the Penal Law, McKinney's Consol.Laws, c. 40 of the State of New York was as follows:

"§ 947. Verbal false pretense not criminal

5. See note 3, supra.

6. See note 3, supra.

Friedman conceded that he knew of no custom to restrict deliveries in the street name to brokerage firms (Ex. 5, p. 27);

(c) After opening the Arlee account, the great majority of the transactions were purchases (Katz' testimony before SEC, Ex. C, February 19, 1962, p. 2425);

(d) Friedman conceded he knew of no specific instructions to Sutro messengers to request certified checks. (Ex. 5, pp. 37, 82) Friedman admitted that the transactions with Arlee involved in the complaint differed in no respect from hundreds of prior transactions other than the fact that the checks were not paid (Ex. 5, p. 85);

(e) Actually, as Friedman conceded, the head runner made an examination of the checks as received, and it was his responsibility at that level; then the head runner passed the checks to the cashier's department for verification and deposit (Ex. 5, p. 31);

(f) No matter what the formal receipts stated, the checks received by Sutro were not certified. (Stipulation, Ex. 2) There is no evidence that Friedman at any time made inquiry with respect to the practice as to certification of Arlee's checks, apparently approving of whatever procedure was followed by Sutro's supervising employees;

(g) Although Friedman stated that it did not occur to him at any time that securities being purchased (by Arlee) through Sutro were being sold elsewhere (Ex. 5, p. 86), I am not persuaded that he was frank as to this feature. (See also Findings 7 and 8; see also Discussion and note 2, supra)

23. I find (1) that Sutro knew or had reason to know that the securities were being delivered to Arlee before payment, and (2) knew that the securities were customarily paid for later by uncertified checks, and (3) that Sutro knew that the formal receipt procedures (set forth in Findings 10 and 13) were, in fact, being continuously disregarded.

24. Sutro, by delivery without payment of securities to Arlee, extended credit to Arlee. (Ex. 5, pp. 40–41) By accepting uncertified checks after delivery of the certificates to Arlee, plaintiff also extended credit to Arlee for the further period of time necessary to collect the checks. (Ex. 4, pp. 58–61) Thus, the basic cause of loss was the extension of credit, which was not covered by the bond. (See discussion) At the same time the loss by Sutro was also a loss resulting from trading. (See discussion)

25. The plaintiff has not shown by a fair preponderance of the credible evidence that the loss arose during transit or that theft, either common-law or statutory, occurred during transit or that the loss is covered by the bond. (See prior Findings and discussion hereinafter set forth)

## DISCUSSION

### I.

### THE PLAINTIFF'S CLAIMS

From oral argument of plaintiff's counsel and by his Supplementary Post Trial Memorandum it appears that plaintiff's claim is based upon a "general intent" to defraud in that (1) Arlee purchased securities to be delivered out against sales; (2) Arlee had been insolvent; (3) Arlee delivered checks when it had no money or insufficient funds in its bank accounts (oral argument, December 22, 1966, M 9–12); (4) it was a kite (Id. 13–16); (5) Sutro relied on receipts, whereby it claims Arlee agreed it would not sell the securities before payment (Id. 30–31); (6) the deliveries were secured by fraud (Id. 39–43); (7) Friedman had no knowledge of how Arlee was operating (Id. 56, 73–74) and (8) the purchase of the securities by Sutro for Arlee had been completed and, therefore, the loss was not in trading. (Id. 44–46, 72)

In plaintiff's Supplementary Post Trial Memorandum, counsel in substance states that the evidence of larceny and of Arlee's fraudulent intent is based upon:

(1) Katz' testimony that he purchased the securities solely to "generate" cash;

(2) Stipulations showing Arlee's lack of funds;

(3) Friedman's testimony of Katz' admission of "kiting";

(4) The guilty pleas of Katz and Sinsheimer to larceny charges; and

(5) The complete insolvency of Katz, Sinsheimer and their companies.

Counsel for plaintiff contends that "the fraud of larceny was committed while the certificates in any event were in the physical possession of a messenger who was an employee of Sutro." (Katz testimony before SEC, Ex. C, June 26, 1961, p. 90)

The so-called "kiting technique" by Arlee, referred to by plaintiff, consisted of selling the stock purchased by Arlee through Sutro, taking certified checks on New York banks from these sales through other brokers upon delivery of the stock, depositing these checks, and giving Arlee's uncertified checks to Sutro.

"Kiting" has been defined as, "Writing checks against a bank account where the funds are insufficient to cover them, hoping that before they are presented for payment, the necessary funds will be deposited." Wyckoff, Dictionary of Stock Market Terms (1964). This is a correct definition of the procedures followed by Arlee.

## II.

## THE LOSS DID NOT OCCUR IN TRANSIT UNDER THE TERMS OF THE POLICY

I have already found that the loss did not occur during transit. The plaintiff, through its messengers, delivered the securities and later accepted uncertified checks. Whether the loss was or was not in transit under the terms of this bond must be determined solely by the specific facts of this case on this issue. I find no foundation in cases cited by plaintiff to warrant a conclusion from the facts presented that this loss was in transit.

As heretofore stated (Finding 4), the bond (Ex. 1), with respect to transit, provides as follows:

"C. Any loss of Property * * * through * * * common-law or statutory larceny, * * * while the Property is in transit anywhere in the custody of anyone acting as messenger * * * *SUCH TRANSIT TO BEGIN IMMEDIATELY UPON RECEIPT OF SUCH PROPERTY BY THE TRANSPORTING PERSON* * * * *AND TO END IMMEDIATELY UPON DELIVERY THEREOF AT DESTINATION.*" (Emphasis added)

Thus, it is manifest:

(1) That "transit" unmistakably refers only to a period when the property is in "the custody of any one acting as a messenger," and

(2) That "transit" begins immediately upon receipt of such property by the transporting person (the messenger), and

(3) That "transit" ends "immediately upon delivery thereof [i. e., by the transporting person or messenger] at destination."

Clearly, "transit" in this case began the instant the stock certificates were placed in the possession, custody and control of Sutro's messengers. By the same token, "transit" ended when the messengers transferred possession, custody and control of the certificates by delivery to the representatives of Arlee who physically received them at Arlee's office. Plaintiff's contention that transit did not end until payment by the drawee bank of Arlee's uncertified check ignores the plain verbiage of Clause C, which makes the test of coverage definite and certain, namely, "delivery at destination." There is no ambiguity in the contract.

Although the rules established for construction of contracts apply fully to policies of insurance, McGrail v. Equitable Life Assur. Soc'y, 292 N.Y. 419, 55 N.E.2d 483 (1944), when an insurance contract is clear and precise, unambiguous in its terms, resort to rules of construction is unnecessary, Houlihan v. Preferred Acc. Ins. Co., 196 N.Y. 337, 89 N.E. 927, 25 L.R.A.,N.S., 1261 (1909),

since such terms are to be understood in their plain, ordinary and popular sense. Auerbach v. Maryland Cas. Co., 236 N.Y. 247, 140 N.E. 577, 28 A.L.R. 1294 (1923). Compare Kean v. Maryland Cas. Co., 221 App.Div. 184, 223 N.Y.S. 373 (1st Dept. 1927), aff'd without opinion 248 N.Y. 534, 162 N.E. 514 (1928).

## UNDERWOOD v. GLOBE INDEMNITY CO.

The first case upon which plaintiff particularly relies is Underwood v. Globe Indemnity Co., 245 N.Y. 111, 156 N.E. 632, 54 A.L.R. 485 (1927), which reversed the decision of the Appellate Division in 217 App.Div. 63, (1st Dept. 1926), which had reversed a verdict and judgment for plaintiff after trial. The complaint in Underwood was based upon a brokers' basic blanket bond issued to plaintiff by Globe. The facts in reference to this bond and the loss sustained are set forth by Judge Crane at pages 112–114 of the above Court of Appeals report, 156 N.E. 632. It is not necessary to repeat these facts here.

The Court of Appeals held that the loss was covered by the policy; that, in fact, the bonds were taken from Del Re, the messenger, by false representations constituting theft; that the bonds were never delivered to a customer, as Dunn was not a customer, but a thief posing as a customer in order to steal; that the bonds were still in transit within the meaning of the policy at the time they were taken out for delivery and before delivery in the legal sense of that word to a customer; that there had never been a delivery to end the "transit"; that delivery was to be made only for cash or a certified check. The plaintiff's claim was upheld and the determination by the Appellate Division was reversed.

Thus, the Underwood case is entirely different from the present case. In the present case the delivery was to a bona fide customer, a holder of legal title. There were no specific instructions to the messenger to obtain a certified check. Uncertified checks were customarily accepted. Delivery was complete, although payment was deferred. In the Underwood case the surrender of possession, the transfer of title, and payment were to be simultaneous acts, whereas in the present case the surrender of possession preceded payment. Moreover, the "transit" clause in Underwood is not the same as that in the present case.

Here, the risk of non-payment was assumed by Sutro, and particularly when the transaction was viewed from the practice pursued rather than from the formal specifications of papers which had, in fact, long been disregarded. This was not a risk against which defendant insured. The messenger was not tricked out of possession but surrendered the securities in accordance with practice long followed by Sutro. There is little to sustain the claim that any representation was made by Arlee at or before the time of delivery. There was no larceny in securing the possession from the messenger; no larceny occurred in transit.

## HANSON v. NATIONAL SURETY CO.

The second case on which plaintiff relies is Hanson v. National Surety Co., 257 N.Y. 216, 177 N.E. 425 (1931), reversing 231 App.Div. 55, 246 N.Y.S. 357 (1st Dept. 1930), which had reversed a Special Term decision denying a motion by defendant to dismiss the complaint. In Hanson, the action was on a so-called "Broker's Basic Bond." The terms of the bond and the facts as to the loss are set forth by the Court of Appeals opinion of Judge Lehman at pages 218–219, 177 N.E. 425.

The court indicated that Baran & Co., Inc., which abandoned its office, its officers absconding with the certificates of stock, was a pretended purchaser and that possession was obtained from plaintiffs' messenger by larceny while the property was in the custody of the messenger. Thus, Judge Lehman concluded that the delivery itself was the consummation of a scheme to obtain possession with larcenous intent. Judgment for the plaintiffs was granted, the decision of the Appellate Division being reversed, and that of Special Term, denying defendant's motion, being reinstated.

Aside from the fact that Hanson was a decision on a motion to dismiss a complaint, there are fundamental differences from the present case; (a) The "larceny" was committed in the course of and by procuring the delivery and not afterwards; thus, the theft did not occur subsequent to delivery but in the process of delivery, when the property was tricked out of plaintiffs' hands as effectively as if taken forcibly at the point of a gun; (b) The theft was carried to fruition at the time when the property was delivered up under the circumstances stated.[7] No further act was necessary on the part of the thief to accomplish the wrongdoing.

In the present case the receipts executed by Arlee upon delivery of stocks by Sutro purported to retain title to the stocks in Sutro. In view of the law hereinafter set forth (p. 31), however, it is impossible to give this receipt literal effect; Sutro could hardly retain that which it never had (i. e., title). Cf. Mac Motor Sales, Inc. v. Pate, 148 Me. 72, 73, 90 A.2d 460 (1952); Oliver v. Electrical Prods. Consol., 59 Wash.2d 276, 367 P.2d 618 (1961).

In Hanson v. National Surety Co., supra, the court gave effect to an identical provision in the receipt there in finding larceny by trick and deceit, but that case came up on a motion to dismiss and the court had to presume the truth of the facts pleaded and draw all inferences in favor of the plaintiffs. The issue involved here was apparently never raised, and the court had to assume as fact that the plaintiffs had title and the power to retain it. It did so without discussion and without reference to the cases cited herein. Under these circumstances it cannot be assumed to have modified or overruled principles which were so well established and consistently followed.

Neither Underwood nor Hanson is applicable here.

## NATIONAL SCREEN SERV. CORP. v. UNITED STATES FIDELITY & GUAR. CO.

National Screen Service Corp. v. United States Fidelity & Guar. Co., 364 F.2d 275 (2nd Cir. 1966), upon which plaintiff places much emphasis, is not controlling as to any issue here. There, National sued on a "Comprehensive General Liability Policy" which protected National against all potential liability for negligence in connection with its business (motion picture previews and displays) except to the extent explicitly excluded. A so-called "products hazard exclusion" provided that the policy did not cover "products hazards," as defined as follows:

"The term 'products hazard' means (1) the handling or use of, the existence of any condition in or a warranty of goods or products manufactured, sold, handled or distributed by the Named Insured, other than equipment rented to or located for use of others but not sold, if the accident occurs after the Insured has relinquished possession thereof to others and away from premises owned, rented or controlled by the Insured or on premises for which the classification stated in Division (a) of the declarations or in the Company's manual excludes any part of the foregoing". 364 F.2d at 276.

The essence of that decision (National Screen, supra) was that the term "possession," as above used, included *constructive* as well as *actual* possession. Whatever may have been the underlying principles of interpretation leading to this conclusion, I find no determination of the issue as to when "transit" ended under the precise terms of the contract involved here. The decision interprets "possession" but not "in transit."

### OWNERSHIP OF STOCK

■■ Under New York law, when a customer requests a broker to purchase

---

7. See also Comment by Edward C. Lunt, quoted by Henry Nichols in "Bankers and Brokers Blanket Bonds," p. 23 (1933).

stock for him, whether on a cash or margin basis, the broker purchases as agent for the customer and title vests in the customer as soon as he is notified of the purchase. Le Marchant v. Moore, 150 N.Y. 209, 44 N.C. 770 (1896); Caswell v. Putnam, 120 N.Y. 153, 24 N.E. 287 (1890); Markham v. Jaudon, 41 N.Y. 235 (1869). See also Meyer, The Law of Stockbrokers and Stock Exchanges, § 41, at p. 254 (1931) and cases cited.[8] Since the broker generally uses his own funds in making the purchase, he becomes a creditor of the customer for the amount of the purchase price and his commission. His only interest in the stock, however, is a lien in the form of a pledge which dissolves as soon as he surrenders physical possession of the property to the customer. 12 C.J.S. Brokers § 99, p. 236. Cf. 72 C.J.S. Pledges § 19 (c), p. 24.

■ In any event, whether or not Sutro retained any lien, whatever rights Sutro still held in the securities it delivered to Arlee did not postpone delivery or prolong transit. Transit had ceased under the terms of the bond. The termination of transit was not conditional; transfer of possession concluded transit. There was not the slightest indication of an intent on the part of defendant to insure any lien of plaintiff. After the messenger had turned over possession to Arlee, how the securities could still be in transit does not appear.

Neither Underwood nor Hanson held, as the plaintiff claims, that transit was not to be deemed complete until payment was received. As noted above, the larcenies in both of those cases were completed at the time the physical transfer of possession was made. In Hanson the court assumed that the retention of title by the receipt was effective as an element of the crime of larceny by trick

and deceit, but not as extending the period of transit.

## III.

## PRIOR TO DELIVERY THE TRANSACTION WAS NOT A LARCENY, A THEFT, OR A TRICK, DECEIT OR FRAUD

It is clear that no trick, deception or fraud of any kind was perpetrated upon the messenger. The property was delivered freely, voluntarily and without inducement, misrepresentation or fraud.

The securities in question were delivered to Arlee at about 10:30–11:30 o'clock in the morning and a receipt delivered to the messenger. At about 3:00 or 4:00 o'clock in the afternoon the messenger returned to Arlee's office, surrendered the receipt and received uncertified checks from Arlee. The checks were later found to be uncollectible.

## THE GUILTY PLEAS BY ARTHUR KATZ AND LEO SINSHEIMER ARE NOT CONTROLLING

The indictment against Arthur Katz and Leo Sinsheimer (Ex. 8) in effect charged in the first count that on May 23, 1961 these defendants, with intent to deprive and defraud Sutro of certain securities, stole securities having an aggregate value of $180,831.91 by false and fraudulent representations and pretenses to the effect that said defendants had sufficient funds in and credit with the Perth Amboy National Bank for payment of sixteen checks totalling $302,-894.76.

The second, third and fourth counts are similar.

Although at the time of the loss by Sutro, Leo Sinsheimer was President and Arthur Katz was Secretary of Arlee, they were not parties to this action at any time any more than defendant here

---

8. For example, it has been held that if the broker should sell or hypothecate the securities without the permission of the customer, he is liable for conversion rather than breach of contract, Markham v. Jaudon, supra, and the liability may be criminal as well as civil. People v. Atwater, 229 N.Y. 303, 128 N.E. 196 (1920); Wilson v. Morley, 236 App.Div. 546, 547, 260 N.Y.S. 124, rehearing denied 237 App.Div. 831, 260 N.Y.S. 1009 (2nd Dept.1932).

was a party to, or represented at, the time of the pleas.

It is, of course, fundamental that a plea of guilty is equivalent to a conviction. It is equally true that a plea of guilty is an admission against interest *(by the party so pleading)* as to facts likewise concerned in a civil action *by such party or against such party*. Rain v. Pavkov, 357 F.2d 506 (3rd Cir. 1966); Ando v. Woodberry, 8 N.Y.2d 165, 203 N.Y.S.2d 74, 168 N.E.2d 520 (1960); Walther v. News Syndicate Co., 276 App. Div. 169, 176, 93 N.Y.S.2d 537 (1st Dept. 1949).

It is also fundamental, however, that as against a third party a plea of guilty is mere hearsay and not admissible over objection unless it comes within some exception to the hearsay rule in the particular case. Glasier v. Troanovitch, 264 App.Div. 940, 36 N.Y.S.2d 281 (4th Dept. 1942); Lipman Bros. v. Hartford Acc. & Indem. Co., 149 Me. 199, 100 A.2d 246, 252 (1953). In this case there are no apparent grounds for admitting the evidence of the pleas, but no objection was raised to it. Thus, the evidence must be considered for what it is worth, Matter of Findlay, 253 N.Y. 1, 11, 170 N.E. 471 (1930); Flora v. Carbean, 38 N.Y. 111, 113–114 (1868); Ford v. Snook, 205 App.Div. 194, 198, 199 N.Y.S. 630 (4th Dept. 1923); Matter of Condon, 124 Misc. 845, 846, 208 N.Y.S. 797 (Surrog. Ct. 1925), but it is certainly not conclusive as against the defendant and, as evidence that the loss was caused by larceny in transit, is not supported by the other evidence submitted concerning the conduct of Katz and Sinsheimer. Compare Ford v. Snook, supra. It is also obvious that to be seriously considered, the guilty plea must be to a charge equivalent to the claim made by plaintiff.

## LARCENY

"Larceny" under New York Penal Law § 1290, as enacted in 1942, includes the original common-law crimes of larceny by asportation and larceny by trick and deceit, and also embezzlement and obtaining property by false pretenses, crimes of statutory origin. The 1942 enactment simplified the pleading of these crimes but made no substantive changes in them. People v. Karp, 298 N.Y. 213, 81 N.E.2d 817 (1948), reversing 273 App.Div. 779, 75 N.Y.S.2d 169 (2nd Dept. 1947). Plaintiff has not shown that Katz and Sinsheimer committed any of these crimes. There was certainly neither larceny by asportation nor embezzlement.[9] The plaintiff relies indiscriminately on elements of larceny by trick and deceit and larceny by false pretenses. At one point it argues that the signing of the receipts by Arlee constituted the element of fraud, since Arlee did not intend to hold the securities "solely * * * to inspect and verify the same," but intended to deliver them out for sale before payment. As promissory representations these might form an element of larceny by trick and deceit, People v. Miller, 169 N.Y. 339, 62 N.E. 418 (1902), but not of false pretenses, People v. Blanchard, 90 N.Y. 314 (1882), but there can be no larceny by trick and deceit since Sutro gave up its lien along with possession of the securities. People v. Sloane, 254 App.Div. 780, 781, 4 N.Y. S.2d 784 (2nd Dept. 1938), aff'd 279 N.Y. 724, 18 N.E.2d 679 (1939); People v. Majorana, 155 App.Div. 431, 140 N.Y.S. 8 (2nd Dept. 1913). On the other hand, it may be larceny by false pretenses for the owner of an article to take it by fraud from one who holds a possessory lien, People ex rel. Travis v. Sheriff of Cortland, 275 App.Div. 444, 90 N.Y.S.2d 848 (3rd Dept. 1949), but plaintiff has shown no false representation of an existing fact prior to the delivery. It cites the guilty pleas of Katz and Sinsheimer to indictments for larceny by false pretenses, but the misrepresentations alleged there were the unpaid checks, and the

---

9. There could have been embezzlement if the reservation of title in the receipt were valid, People v. Gluck, 117 App.Div. 432, 102 N.Y.S. 758, (1st Dept.), rev'd on other grounds 188 N.Y. 167, 80 N.E. 1022 (1907), but even that would not help the plaintiff here since the conversion would occur after transit if the original possession were lawful, as it must be for embezzlement.

checks were not due or given until after delivery of possession and the end of transit.

Beyond these considerations of the law of larceny, however, plaintiff has failed to prove two more significant elements of larceny: (1) That Katz and Sinsheimer intended to steal the securities, and (2) that Sutro relied upon any representation made by Arlee.

█ Fraud may not be based on statements which are promissory in character, 37 C.J.S. Fraud § 11, p. 231, unless at the time of making the promise the promisor had no intention of keeping the promise. Keers & Co. v. American Steel & Pump Corp., 234 F.Supp. 201, 203 (S.D.N.Y.1964).

█ Intent involves the purpose to use a *particular* means to effect a *definite* result. People v. Molineux, 168 N.Y. 264, 297, 61 N.E. 286, 296 (1901). In that case, Werner, J., wrote:

"In the popular mind intent and motive are not infrequently regarded as one and the same thing. In law there is a clear distinction between them. Motive is the moving power which impels to action for a definite result. Intent is the purupose to use a particular means to effect such result. * * *"

Quoted with approval in People ex rel. Hegeman v. Corrigan, 195 N.Y. 1, 12, 87 N.E. 792 (1909). Accord, Williams v. State, 113 Neb. 606, 204 N.W. 64, 65 (1925); Baker v. State, 120 Wis. 135, 145–146, 97 N.W. 566 (1903).

█ A specific intent means more than a mere general intent to commit the act. 22 C.J.S. Criminal Law § 32, p. 116. "Whenever a specific intent is required by statute to constitute a crime, * * * such intent * * * must be alleged and proved. The criminal intent must be united with an overt act and they must concur in point of time. The law does not concern itself with mere guilty intention, unconnected with any overt or outward manifestation." People v. Walrath, 279 App.Div. 56, 58, 108 N.Y.S.2d 54 (3rd Dept. 1951). See also State v. Bassett, 86 Idaho 277, 385 P.2d 246 (1963).

█ Moreover, if Sutro knew the truth about Arlee's operations, including its buying and selling, its manipulation of checks, its use of uncertified checks, Sutro was neither deceived nor defrauded. 37 C.J.S. Fraud § 27, p. 267 and cases cited. If Sutro was in such a position that it must or should have known the facts, its knowledge thereof may be inferred. Id. at 268 and cases cited. One of the elements of fraud is that the hearer must be ignorant of the falsity of the representation. Id. at § 3, p. 215 and cases cited.

█ █ To recover for fraud, Sutro must have acted in reliance upon representations made by Arlee. Sager v. Friedman, 270 N.Y. 472, 479, 1 N.E.2d 971 (1936). No one can secure redress for a representation he knew to be false or for failure to disclose facts which he knew to exist. 37 C.J.S. Fraud § 27, p. 267. The complaining party (Sutro) must have been deceived by Arlee. United States v. Anastasio, 226 F.2d 912, 917 (3rd Cir. 1955).

Plaintiff claims that it was ignorant of Arlee's fraud and accepted uncertified checks due to negligence and, therefore, was still covered by the terms of the bond.

█ A contract of indemnity which purports to relieve the indemnitee for the results of a failure to exercise ordinary care, by himself or his employees, should be strictly construed, and will not be held to provide such indemnification unless so expressed in clear and unequivocal terms. 42 C.J.S. Indemnity § 12, pp. 580, 581; Pennsylvania R. R. v. The Beatrice, 161 F.Supp. 136, 149–150 (S.D.N.Y.1958), aff'd 275 F.2d 209 (2nd Cir. 1960); The Zeller No. 14, 74 F.Supp. 538 (E.D.N.Y.1947); Walters v. Rao Elect. Equipment Co., 289 N.Y. 57, 43 N.E.2d 810, 143 A.L.R. 308 (1942); Thompson-Starrett Co. v. Otis Elevator Co., 271 N.Y. 36, 2 N.E.2d 35 (1936). Although in this case the bond does cover Sutro's negligence, the loss arose

from a course of conduct followed by Sutro over a period of nine months while the essential facts were in the hands of responsible agents of the partnership, as noted in Finding 22. Such conduct must be deemed deliberate, not merely negligent.

The plaintiff has not shown that the loss occurred because of theft, fraud, deceit or misrepresentation under the terms of the bond.

## IV.

### THE LOSS WAS SUSTAINED IN "TRADING"

 The "trading" exception is set forth above in Finding 4. The word "trading" as used (i. e., in such bonds) means the operation of the usual occupation of buying and selling stocks. Degener v. Hartford Acc. & Indemn. Co., 92 F.2d 959, 960 (3rd Cir. 1937); Condon v. National Sur. Corp., 22 App.Div. 2d 305, 308, 254 N.Y.S.2d 620 (1st Dept. 1964) and cases cited, aff'd without opinion 16 N.Y.2d 775, 262 N.Y.S.2d 499, 209 N.E.2d 819 (1965).

 When the loss occurs by reason of an employee's authorized acceptance of an uncertified check upon delivery of the securities, the "trading" exception bars recovery. Kean v. Maryland Casualty Co., 221 App.Div. 184, 223 N.Y.S. 373 (1st Dept. 1927), aff'd without opinion 248 N.Y. 534, 162 N.E. 514 (1928).

In Sade v. National Sur. Corp., 203 F.Supp. 680 (D.D.C.1962), Youngdahl, D. J., interpreted the word, "trading," as used in the policy to indemnify plaintiffs against certain losses with the exception of those " 'resulting directly or indirectly from trading' as not having the restricted meaning for which plaintiffs contend, but the same meaning it has in any mercantile business, namely, the buying and selling of the commodities— in the instant case, the buying and selling of securities on a customer's account." (pp. 685–686) Judge Youngdahl's decision was affirmed on the opinion below by the Court of Appeals, 114 U.S.App. D.C. 281, 314 F.2d 286 (1963). Cf. Harris v. National Sur. Co., 258 Mass. 353, 155 N.E. 10 (1927).

As heretofore indicated, plaintiff asserts that the loss was not in "trading" because the purchase of the securities by Sutro for Arlee had been completed. It is true that Sutro had purchased and paid for the securities as broker for Arlee. Yet, an inherent part of the completion of the transaction was Sutro's collection from Arlee. Plaintiff's restricted interpretation of "trading" is unwarranted.

The loss was sustained directly or indirectly from "trading" and is not covered under Insuring Clause A, D or E or elsewhere in said bond.

## V.

### THE LOSS OCCURRED BECAUSE OF PLAINTIFF EXTENDING CREDIT TO ARLEE

The "loan" exception is set forth above in Finding 4.

 A check of itself is a mere order upon a bank for the payment of money. Harris v. Clark, 3 N.Y. 93 (1849); Glennan v. Rochester Trust & S. D. Co., 209 N.Y. 12, 16, 102 N.E. 537 (1913). Mere *delivery* of a check does not operate as a payment of a debt, Bradford v. Fox, 38 N.Y. 289, 290 (1868), "unless in some special case, if such a case can be supposed, where the check was taken in absolute payment and extinguishment of the debt." Thomson v. Bank of British North America, 82 N.Y. 1, 8 (1880). Thus, when Arlee delivered its uncertified checks to Sutro it still remained liable in all respects for payment of the debt for the purchase and Sutro extended credit to Arlee.

 The mere delivery of these securities to Arlee by the messengers upon an express or implied promise to pay was equally an extension of credit, although it was not a loan. "Ordinarily a loan is an investment made for the purpose of securing interest income." Allen v. Edwards, 114 F.Supp. 672, 676 (M.D. Ga.1953). "In order to have a loan, there must be an agreement, either expressed

or implied, whereby one person advances money to the other and the other agrees to repay it upon such terms as to time and rate of interest, or without interest, as the parties may agree." National Bank of Paulding v. Fidelity & Cas. Co., 131 F.Supp. 121, 123–124 (S.D.Ohio 1954). Thus, the transaction was not a loan but it was a loss from credit and from "trading." (See cases above cited) Although the bond does not specify that losses from credit are excepted, I find nothing in the bond which covers a credit loss such as sustained by plaintiff.

■ A contract of indemnity should be construed so as to cover all losses, damages or liabilities to which it reasonably appears to have been the intention of the parties that it should apply, but not to extend to losses, damages, or liabilities which are neither expressly within its terms nor of such character that it can reasonably be inferred that they were intended to be within the contract. 42 C.J.S. Indemnity § 12, p. 579. See, e. g., Standard Oil Co. v. Robins Dry Dock & Repair Co., 25 F.2d 339 (E.D. N.Y.1928), aff'd 32 F.2d 182 (2nd Cir. 1929); Nau v. Vulcan Rail & Constr. Co., 286 N.Y. 188, 36 N.E.2d 106, rehearing denied 287 N.Y. 630, 39 N.E.2d 267 (1941).

## VI.

### THE BURDEN OF PROOF

■ The burden of proof is on plaintiff as indemnitee to prove clearly all the material elements of its cause of action against the defendant indemnitor. 42 C.J.S. Indemnity § 35, p. 626; New Broad Co. v. Bay Chester Marble & Tile Co., Sup., 147 N.Y.S.2d 831, 835 (City Ct., New York City 1956) (Baer, J.). "It [the plaintiff indemnitee] has the burden to establish the contract of indemnification and all material elements of its cause of action."

### CONCLUSIONS OF LAW

1. This court has jurisdiction of the parties and the subject matter under the provisions of Title 28 U.S.C. §§ 1332 and 1441.

2. The substantive law of the State of New York governs the rights of the parties.

3. The term, "transit," as used in the bond and applied to the facts of this case, is not ambiguous and is to be understood in its plain, ordinary and popular sense. It refers only to the transportation of the certificates by messenger up to and including the physical delivery to the customer. The attempt by Sutro to reserve title to the securities did not extend the period of "transit."

■ 4. Plaintiff's alleged loss did not occur while the securities were "in transit."

5. The plaintiff has not proved by a fair preponderance of the credible evidence that, when or before Arlee received the securities from Sutro, Arlee intended to steal the certificates.

6. Plaintiff has not shown that its loss resulted from its reliance upon any representation made to it by Arlee. It knew, or should have known, the manner in which it was making deliveries to Arlee, the number of securities it was delivering, that Arlee was paying it with uncertified checks, and the method by which Arlee was paying those checks. Arlee made no representation of its ability to pay other than that implied in giving the checks to Sutro after delivery of the certificates.

7. Sutro has failed to prove any misrepresentation of any existing fact by Arlee before Sutro surrendered its possessory lien upon the securities.

8. The plaintiff has not shown by a fair preponderance of the credible evidence that the loss occurred because of the theft, fraud, deceit or misrepresentation under the terms of the bond.

9. The plaintiff's loss arose from the acceptance of uncertified checks issued by Arlee to pay for the securities it purchased, which checks later proved uncollectible, and, thus, plaintiff's loss resulted from "trading" and is expressly excluded from coverage by the terms of the bond.

10. Plaintiff, by delivery of securities to Arlee without payment and by later accepting uncertified checks, extended credit to Arlee, and such a loss is not covered by the bond.

11. The plaintiff has not shown by a fair preponderance of the credible evidence that defendant is liable under the bond for the loss sustained.

12. Defendant is entitled to judgment dismissing the complaint, together with the costs and disbursements of this action.